16 F.3d 552
 62 USLW 2579, 25 Bankr.Ct.Dec. 486, Bankr.
L. Rep. P 75,803
 In re SWEDELAND DEVELOPMENT GROUP, INC., Debtor.
The RESOLUTION TRUST CORPORATION, as Conservator of Carteret
Federal Savings Bank
v.
SWEDELAND DEVELOPMENT GROUP, INC.; Haylex Acquisition
Company; Unsecured Creditors Committee; First
Fidelity Bank, National Association.
Swedeland Development Group, Inc., Appellant.
 No. 92-5552.
 United States Court of Appeals,
Third Circuit.
 Argued June 7, 1993.
Decided Feb. 25, 1994.
 
 Robert A. Baime (argued), Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime, Roseland, NJ, for appellant.
 Michael D. Sirota (argued), Cole, Schotz, Bernstein, Meisel & Foreman, Hackensack, NJ, for Unsecured Creditor's Committee.
 Frank J. Vecchione (argued), Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for appellee The Resolution Trust Corp. as Conservator of Carteret Federal Sav. Bank.
 Argued June 7, 1993.
 Before GREENBERG, NYGAARD, and LEWIS, Circuit Judges.
 Reargued in banc Feb. 2, 1994.
 Before SLOVITER, Chief Judge, and BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, and LEWIS, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 I. INTRODUCTION
 
 1
 Swedeland Development Group, Inc., a debtor in possession under Chapter 11 of the Bankruptcy Code, appeals from a district court order entered on September 17, 1992, which reversed three orders of the bankruptcy court. Two of the orders of the bankruptcy court authorized Swedeland to obtain post-petition loans on a superpriority basis pursuant to 11 U.S.C. Sec. 364(d)(1) for use in construction of Swedeland's golf course and residential development. The third order denied an application by Carteret Federal Savings Bank,[1] Swedeland's principal prepetition creditor, for relief from the automatic stay which arose when Swedeland filed its Chapter 11 petition. Carteret sought relief pursuant to 11 U.S.C. Sec. 362(d) so that it could foreclose on Swedeland's assets on which it held a mortgage securing Swedeland's indebtedness.
 
 
 2
 Swedeland argued in the district court that Carteret's appeals from the orders authorizing the loans on a superpriority basis should be dismissed, as pending the appeals Carteret had not obtained a stay of the orders authorizing the loans as provided in 11 U.S.C. Sec. 364(e). But the district court rejected that argument and decided the appeals on the merits. We agree with Swedeland that the appeal from one of the bankruptcy court orders authorizing a post-petition loan was moot in the district court and should have been dismissed, but we determine that the appeal from the other order was not moot. We further conclude that the district court correctly held that the bankruptcy court erred in entering the non-moot order authorizing a post-petition loan. Finally, we agree with the district court that the bankruptcy court erred in denying Carteret relief from the automatic stay. Consequently, to the extent that the district court should have dismissed the appeal, we will vacate its order, but we otherwise will affirm the order of the district court.
 
 II. BACKGROUND
 
 3
 This case arises from Swedeland's development of a 508-acre golf course and residential project located in Hardystown Township, Sussex County, New Jersey, and known as Crystal Springs. Swedeland acquired the property in April 1989 and began construction later that year. The plans for the project included homes, a golf course, tennis courts, and an infrastructure such as roads and sewers. The golf course with its clubhouse opened on Memorial Day in 1991.
 
 
 4
 The project was very large and required substantial financing for acquisition of the property and construction of the improvements. Carteret supplied the financing through a series of loans totaling $37,000,000.[2] For security, Carteret obtained a first mortgage on Swedeland's real estate in the Crystal Springs project, personal guarantees from Swedeland's principals, and a mortgage on real estate Swedeland owned which was located in Jefferson Township, Morris County, New Jersey, and known as the Bowling Green Golf Course. The terms of the Carteret-Swedeland loan provided for the first $42,100 from the sale of each residential unit at Crystal Springs to be paid to Carteret, $12,100 to be applied to the loan for the Crystal Springs Golf Course and the balance to be applied to the other acquisition and construction loans.
 
 
 5
 Unfortunately, the project ran into financial difficulty which led Swedeland to seek additional financing from Carteret in April 1991. But Carteret was barred from granting that financing by restrictions in the Financial Institutions Reform, Recovery and Enforcement Act of 1989. Carteret, however, permitted Swedeland to use $2,250,000 from a collateral security escrow account established pursuant to the Swedeland-Carteret loan agreement to cure Swedeland's potential monetary defaults.
 
 
 6
 Apparently this additional financing was insufficient, for on August 2, 1991, Swedeland filed a petition under Chapter 11 in which it showed its debt to Carteret as being slightly in excess of $36,000,000. While Carteret contends that somewhat more was due, we are not concerned with the difference as it is undisputed that Carteret's security has been valued at all times since the filing of Swedeland's Chapter 11 petition at far less than Swedeland's debt to it. Indeed, the parties have accepted an appraisal obtained by Carteret, stating that the value of the Crystal Springs property is $18,495,000. When Swedeland filed the petition, 900 residential units remained to be built. Following the filing of the petition and a series of hearings, the bankruptcy court allowed Swedeland, over Carteret's objections, to use Carteret's cash collateral for operating expenses pursuant to 11 U.S.C. Sec. 363. This cash collateral was derived from the proceeds of sales of units in the development.
 
 
 7
 Not surprisingly, in the fluid situation presented by the ongoing construction of a major real estate project, events moved rapidly in the bankruptcy court. Swedeland filed a motion pursuant to 11 U.S.C. Sec. 364(d)(1) to obtain working capital and construction financing on a superpriority basis from Haylex Acquisition Company, L.P. for construction of the development. Section 364(d)(1) provides that the court, after notice and hearing "may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if": (1) the trustee is unable to obtain such credit otherwise, and (2) "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." Such financing would, of course, have subordinated Carteret's lien to a lien securing Haylex's loan. Swedeland justified its motion by urging that the Crystal Springs Golf Course would generate a positive cash flow, the residential units could be completed and sold, and the completion of the project by the end of the century would result in Carteret being paid in full. Thus, Swedeland argued that Carteret was adequately protected.
 
 
 8
 While Carteret seems not to have contended that Swedeland could obtain the post-petition financing without the creation of a superpriority lien, it nevertheless opposed Swedeland's application for authority to obtain the Haylex loan, as it disputed the assumptions underlying the application. In addition, Carteret sought relief from the automatic stay so it could foreclose on its mortgage. The bankruptcy court held an evidentiary hearing on the cross-applications, and on March 6, 1992, authorized Swedeland to borrow $840,000 from Haylex on a superpriority basis. On March 9, 1992, the bankruptcy court denied Carteret's motion for relief from the automatic stay, concluding that Carteret was adequately protected since there was a reasonable possibility that Swedeland could reorganize successfully. See 11 U.S.C. Sec. 362(d). Carteret appealed to the district court from the orders of March 6 and March 9, 1992, and unsuccessfully sought a stay of the March 6 order from both the bankruptcy court and the district court. Following denial of the stay, Haylex disbursed its loan in full to Swedeland which has expended the funds.
 
 
 9
 Prior to the entry of the above orders, Swedeland had filed an application to obtain other superpriority financing from First Fidelity Bank. Once again, Swedeland was successful and on April 10, 1992, the bankruptcy court authorized it to borrow up to $3,160,000 from First Fidelity on a revolving basis. Though Carteret appealed from that order, it did not seek to have it stayed pending the appeal. The parties agree that First Fidelity has disbursed some, but not all, of its loan as authorized by the April 10, 1992 order. We understand that the Haylex funds were used for working capital and the First Fidelity funds were used for construction.
 
 
 10
 The district court, exercising jurisdiction under 28 U.S.C. Sec. 158(a), reversed the three bankruptcy court orders in a comprehensive memorandum opinion dated September 16, 1992. In its discussion, the district court first dealt with Swedeland's argument, advanced in a motion to dismiss Carteret's appeals, that the appeals from the orders of March 6 and April 10, 1992, authorizing the Haylex and First Fidelity loans were moot. Swedeland predicated this motion principally on 11 U.S.C. Sec. 364(e) which provides as follows:
 
 
 11
 The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.
 
 
 12
 Swedeland reasoned that the appeals were moot as the district court could not alter the priority of the Haylex and First Fidelity liens because Carteret did not obtain a stay of either financing order pending appeal.
 
 
 13
 The district court, however, rejected the mootness argument, observing that the plain language of 11 U.S.C. Sec. 364(e) provided that orders under 11 U.S.C. Sec. 364(d) are subject to "reversal or modification on appeal." Thus, it determined that while section 364(e) limited "the relief available in the absence of a stay by protecting the validity of any debt incurred and the priority of any lien granted to a good faith lender under Section 364(d), it does not prohibit appeals of orders granted." The district court cited Miami Center Ltd. Partnership v. Bank of New York, 820 F.2d 376, 379 (11th Cir.1987), cert. denied, 488 U.S. 823, 109 S.Ct. 69, 102 L.Ed.2d 46 (1988), and In re AOV Indus., Inc., 792 F.2d 1140, 1147 (D.C.Cir.1986), in support of this holding.
 
 
 14
 The court next stated that if "a reviewing court is able to provide effective relief, the mootness doctrine simply does not apply." The court then indicated, recognizing that it intended to remand the matter, that the bankruptcy court, subject to the limitations in section 364(e) protecting the interests of a post-petition lender when a stay has not been granted, might grant relief in various ways. Thus, the district court stated that relief might be granted enjoining Swedeland from utilizing any proceeds of the loans, ordering it to return funds it borrowed, prohibiting First Fidelity from making additional advances, voiding the interest reserves established under the financing orders, voiding Haylex's and First Fidelity's future obligations, granting Carteret relief from the automatic stay, and granting any further relief as may be just and proper.
 
 
 15
 The district court next addressed the March 6 and April 10, 1992 orders on the merits, in particular considering whether Carteret had adequate protection as required by section 364(d). The court recognized that the bankruptcy court's conclusion that Carteret had adequate protection was a factual finding which it thus reviewed using the deferential clearly erroneous standard. See In re O'Connor, 808 F.2d 1393, 1397 (10th Cir.1987). Ultimately the district court held that the bankruptcy court's conclusions were clearly erroneous "because [they] rested on the conferral of benefits upon Carteret to which Carteret was already entitled, and because the build-out does not contain the kind of assurance necessary under the Bankruptcy Code and the cases to constitute adequate protection."
 
 
 16
 Finally the district court addressed Carteret's appeal from the order denying relief from the automatic stay. The court noted that under 11 U.S.C. Sec. 362(d)(2), Carteret could obtain relief from the automatic stay if Swedeland did not have equity in the property and the property was not necessary to an effective reorganization. Obviously, Swedeland had no equity as its obligation to Carteret was approximately double the Crystal Springs appraisal value of $18,495,000. The court, after recognizing that there was no equity, indicated that there "is no evidence in the record that an effective reorganization is in progress." Consequently, it concluded that the bankruptcy court's decision denying relief from the automatic stay was clearly erroneous.[3]
 
 
 17
 In accordance with its opinion, on September 17, 1992, the district court entered an order denying Swedeland's motion to dismiss Carteret's appeals from the financing orders and reversing the orders of March 6, March 9, and April 10, 1992. The district court remanded the case to the bankruptcy court to grant Carteret relief consistent with the district court's opinion "taking into account the circumstances as they may exist at the time such relief is granted." By a supplemental letter of September 23, 1992, the district court indicated that the "superpriority liens perfected prior to the date of the reversal of the Bankruptcy Court's order providing for such liens remain in effect." Accordingly, the court stated that vacation of the bankruptcy court's orders "should only affect creation of future superpriority liens and would not impair vested rights already in existence."
 
 
 18
 Swedeland appealed to this court from the district court's order of September 17, 1992, and it then moved for a stay of that order. The district court granted the stay, but only to the extent of allowing First Fidelity to advance funds for the completion of the 19 residential units then under construction. The balance of the First Fidelity funds could not be advanced. Accordingly, we calculate that Swedeland has not constructed approximately 881 units projected for the development.
 
 
 19
 We have jurisdiction under 28 U.S.C. Sec. 158(d).[4] We exercise plenary review over all aspects of the district court's orders. In effect, we therefore review the bankruptcy court's findings with respect to whether Carteret had adequate protection and whether Carteret should be granted relief from the automatic stay under the clearly erroneous standard. See In re Sharon Steel Corp., 871 F.2d 1217, 1222-23 (3d Cir.1989); Resyn Corp. v. United States, 851 F.2d 660, 664 (3d Cir.1988).
 
 III. DISCUSSION
 1. Mootness
 
 20
 Initially we observe that we are concerned in this case with mootness predicated on statutory and prudential considerations.[5] See In re AOV Indus., Inc., 792 F.2d at 1147. Thus, we start our discussion by referring to section 364(e), the source of Swedeland's mootness argument. That section does not, in itself, suggest that an appeal from an order authorizing the creation of a superpriority lien under section 364(d) should be dismissed by reason of mootness when an appellant fails to obtain a stay pending an appeal. Indeed, section 364(e) never mentions that an appeal may be dismissed if a stay is not obtained.
 
 
 21
 In fact, we draw the exact opposite inference from section 364(e), for it provides that the "reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of [the] debt ... or any priority or lien so granted ... unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." While the section only protects "an entity that extended such credit in good faith," this requirement is not germane to a mootness analysis turning on an appellant's failure to obtain a stay pending appeal. Furthermore, Carteret challenges neither Haylex's nor First Fidelity's good faith.
 
 
 22
 Thus, it seems to us that there is no escape from the logic that inasmuch as section 364(e) provides for the consequences of the reversal or modification of an order under section 364(d) when the order has not been stayed pending appeal, it is impossible to conclude that section 364(e) in itself requires that an appeal be dismissed if a stay is not obtained. After all, neither Swedeland nor anyone else can explain how there can be a "reversal or modification" of an order, if the appeal from the order has been dismissed.
 
 
 23
 Yet this exercise in logic is not dispositive of the mootness issue for even though section 364(e) standing alone does not require dismissal of an appeal when a stay is not granted, it might establish circumstances which under law other than section 364(e) require dismissal of the appeal. Thus, in our consideration of the mootness argument we cannot limit our inquiry to an examination of section 364(e). In expanding our mootness analysis we start with Church of Scientology v. United States, --- U.S. ----, ----, 113 S.Ct. 447, 450, 121 L.Ed.2d 313 (1992), in which the Supreme Court emphasized that an appeal is not to be dismissed as moot merely because a court cannot restore the parties to the status quo ante. Rather, when a court can fashion "some form of meaningful relief," even if it only partially redresses the grievances of the prevailing party, the appeal is not moot. Id. (emphasis in original). See also General Elec. Co. v. Cathcart, 980 F.2d 927, 934 (3d Cir.1992) (" 'an appeal will be dismissed as moot when events occur during [its] pendency ... which prevent the appellate court from granting any effective relief ' ") (emphasis added) (quoting In re Cantwell, 639 F.2d 1050, 1053 (3d Cir.1981)). Thus, it is evident that although the disbursement of a loan under a section 364(d) order creates a superpriority lien insulated from the effects of a modification or reversal on appeal absent a stay, an appeal from the section 364(d) order following the disbursement is not necessarily moot in the absence of a stay.
 
 
 24
 Accordingly, the district court took precisely the correct approach when it recognized that a mootness analysis required it to consider whether Carteret could obtain effective relief even though the superpriority status of Haylex's and First Fidelity's loans had to be preserved. In exercising our plenary review, we will take the same approach.
 
 
 25
 We initially consider the First Fidelity loan. It is undisputed that some, but not all, of that loan had been disbursed before the district court reversed the April 10, 1992 order, and Carteret acknowledges that to the extent that the loan was disbursed, the validity of the debt incurred and the priority of the superpriority lien securing it cannot be affected. The argument as to that loan centers on the undisbursed funds. Swedeland contends that it may draw down those funds, and, if it does, First Fidelity will have a priority over Carteret as to all the funds First Fidelity disburses. As Swedeland sees the situation, the appeal to the district court was therefore moot because the district court could not affect any portion of the First Fidelity loan as authorized by the bankruptcy court. Thus, according to Swedeland, the district court should not have decided the appeal on the merits. This point is critical for if Swedeland is successful in its argument, it will have access to additional funds so that it can attempt to continue the project.
 
 
 26
 Swedeland explains that section 364(e) supports its argument, as it must be construed to protect post-petition lenders as to all disbursed or projected loans authorized by the section 364(d) order, unless the order is stayed pending appeal.[6] Therefore it urges that even though section 364(e) does not mention the dismissal of an appeal it has that effect. Swedeland contends that post-petition lenders must be given this protection as they will not want to complete only a portion of a loan transaction. If we accept the analysis that a post-petition lender must be protected as to its entire contemplated loan, we would be holding that while section 364(e) in terms would not require a dismissal of an appeal if a stay is not granted, the relief which could be granted upon reversal of a section 364(d) order would be limited greatly, at least when an initial disbursement is made.[7] Our acceptance of the argument, however, would not necessarily moot the appeal for, as our analysis below of the Haylex order demonstrates, the court might nevertheless be able to grant Carteret some effective relief upon reversal of the 364(d) order.
 
 
 27
 But we reject Swedeland's contention. There is, of course, no doubt that, as set forth in Matter of EDC Holding Co., 676 F.2d 945, 947 (7th Cir.1982), section 364(e):
 
 
 28
 seek[s] to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge.
 
 
 29
 Yet we see no reason why section 364(e) should be understood to protect a lender with respect to money it has not disbursed. Surely if a section 364(d) order is reversed and thereafter the lender makes no further disbursements, the lender does not need protection for the funds which it has retained. At most, the lender has lost the expectation of making a loan on terms which it has found acceptable.
 
 
 30
 We acknowledge that a lender might be disappointed in its expectations by a reversal of a section 364(d) order but there is nothing unusual in such frustration. In other contexts, a lender that has given a loan commitment could be frustrated in its expectations if the borrower for any of many reasons does not complete the transaction either before or after taking an initial disbursement. A borrower, among other things, could die, abandon a project, become insolvent, or go bankrupt. Such events are commonplace, and lenders surely recognize that they can happen. In short, we see no reason to rule that upon its first disbursement of funds, First Fidelity acquired such rights that it would be unfair to grant relief to Carteret upon reversal of the April 10, 1992 order.
 
 
 31
 Overall we conclude that application of general mootness principles to the First Fidelity loan clearly establishes that the appeal from that order was not moot when the district court reversed the April 10, 1992 order. In light of our analysis of mootness principles, we hardly could reach any other conclusion as it is obvious that following reversal of the April 10, 1992 order, the court could grant Carteret effective relief simply by prohibiting First Fidelity from making further advances.[8]
 
 
 32
 We reject any suggestion that our result is unfair. While Swedeland understandably focuses on the rights of the post-petition lenders, who we observe seem not to be overly concerned about their positions as they have not participated in this appeal, a pre-petition lender has rights as well. It does, after all, lend its money on the strength of particular security and it is hardly fair to deprive it of that security. Furthermore, our result is bolstered by the practical consideration that it may be impossible for a pre-petition creditor with a meritorious appeal to obtain a stay of a section 364(d) order. In fact, that is exactly what happened in this case, for while Carteret could not obtain a stay of the March 6, 1992 order from the district court, it later convinced that court to reverse the order.
 
 
 33
 Though we hold that the appeal from the April 10, 1992 order was not moot in the district court, we acknowledge that there is some support in cases cited by Swedeland from the Courts of Appeals for the Sixth and Ninth Circuits for a contrary holding predicated on the ground that some of the funds authorized to be lent by that order were disbursed before the reversal. See In re Adams Apple, Inc., 829 F.2d 1484, 1489 (9th Cir.1987); In re Revco D.S., Inc., 901 F.2d 1359, 1364 (6th Cir.1990); and In re Ellingsen MacLean Oil Co., 834 F.2d 599 (6th Cir.1987), cert. denied, 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 33 (1988).[9] We need not, however, analyze these cases in depth because they do not seem to us to address the principle that an appeal is not moot if some meaningful or effective relief can be granted to the appellant even if the parties cannot be returned to the status quo ante upon a reversal. See Church of Scientology v. United States, --- U.S. at ----, 113 S.Ct. at 450.
 
 
 34
 Furthermore, the courts in the above cases have not read section 364(e) as we did above. Thus, after quoting section 364(e) in full, the court in Revco indicated: "[t]here is language then, that absent a stay pending appeal, we may not reverse an authorization to obtain credit or incur debts unless the lender did not act in good faith." 901 F.2d at 1363. Similarly, in Adams Apple the court, after referring to section 364(e) indicated that: "[a]n appellate court may not reverse the authorization to obtain credit or incur debts under section 364 if the authorization was not stayed pending appeal unless the lender did not act in good faith." 829 F.2d at 1487-88. As we already have set forth, in our view section 364(e) does not preclude a court from reversing an authorization absent a stay. What it limits is the effect of a reversal.[10]
 
 
 35
 On the other hand, some cases support our result that the appeal from the April 10, 1992 order was not moot in the district court. See In re Sun Runner Marine, Inc., 945 F.2d 1089, 1095 (9th Cir.1991); Bank of New England v. BWL, Inc., 121 B.R. 413, 417 (D.Me.1990); In re Blumer, 66 B.R. 109, 113 (Bank.App.Panel, 9th Cir.1986) (mootness for purposes of section 364 is defined as a situation in which "funds have been disbursed to persons who are not parties to the appeal or if failure to obtain a stay has permitted such a comprehensive change as to render it inequitable to consider the merits of the appeal"). While we do not discuss these cases at length, we do point out that in In re Sun Runner Marine, Inc., the court distinguished its earlier opinion in Adams Apple, and rejected a post-petition lender's argument that an appeal from a bankruptcy court's order which could have been authorized by section 364 was moot, as it reasoned that the order provided for ongoing financing. 945 F.2d at 1095.
 
 
 36
 Though we hold that the appeal from the April 10, 1992 order was not moot, we reach a different result with respect to the March 6, 1992 order authorizing the Haylex loan. The parties agree that Haylex disbursed the proceeds of that $840,000 loan to Swedeland immediately after the bankruptcy court and district court denied a stay of the March 6, 1992 order. Further, while we have some difficulty in drawing definitive conclusions on this point from the voluminous record, we believe that Swedeland expended the entire proceeds of the Haylex loan for working capital before the district court reversed the March 6, 1992 order.[11] In these circumstances, the bankruptcy court could not on remand enjoin Swedeland from using the proceeds of the Haylex loan nor could it order Swedeland to return the proceeds, as they were gone. The only other particularized possibilities for relief which the district court mentioned were to void the interest reserve established under the March 6, 1992 order, to void Haylex's future obligations under the order, or to grant Carteret relief from the automatic stay.
 
 
 37
 The interest reserve to which the court referred was established pursuant to paragraph 4 of a letter agreement of February 21, 1992, between Haylex and Swedeland, as amended by a letter agreement of March 3, 1992. This agreement provided that an "interest reserve of $100,000 will be deposited by [Swedeland] to be held by [Haylex's] counsel." While the interest reserve was Swedeland's property, it clearly was established for Haylex's benefit, as upon the happening of certain events, which we need not detail, the reserve could be released to Haylex. In these circumstances, we believe that voiding the reserve would impair the security for which Haylex bargained and thus would be inconsistent with the protection afforded it by section 364(e). Therefore, while we do not doubt that Carteret would obtain effective relief by the voiding of the reserve, in view of section 364(e) it cannot be done.
 
 
 38
 The district court also suggested that the bankruptcy court on remand could void Haylex's future obligations. While this suggestion may have been legally sound, we find no future obligations in Haylex's agreement with Swedeland that, if voided, would grant effective relief to Carteret. While it certainly would be in Carteret's interest to preclude Haylex from making further advances to Swedeland, by the time the district court ruled, there were none to be made.
 
 
 39
 Finally, the district court suggested that Carteret could be granted effective relief upon the reversal of a section 364(d) order if the bankruptcy court granted it relief from the automatic stay. While we do not doubt that such relief would be effective, we nevertheless cannot accept this possibility for we believe that a pre-petition lender can be granted relief from the automatic stay only if the predicates for lifting the stay set forth in section 362(d) are satisfied. If the pre-petition lender establishes that it is entitled to relief from the automatic stay, its right to the relief will not be dependent on a reversal of a section 364(d) order.[12]
 
 
 40
 In its brief, Carteret vigorously supports the district court's ruling that the appeal from the March 6, 1992 order was not moot in the district court. Yet it makes no specific suggestions as to what meaningful or effective relief the bankruptcy court could afford Carteret upon the reversal of that order. Rather, it simply indicates that the district court found that effective relief could be given. But, as we have indicated, we do not see how that can be done on any basis the district court suggested without either infringing Haylex's protections under section 364(e) or exceeding the court's powers to grant relief following the reversal of a section 364(d) order. Accordingly, we conclude that we must vacate the order of the district court of September 17, 1992, to the extent that it reversed the bankruptcy court's order of March 6, 1992, and we must remand the matter to the district court to dismiss the appeal to it from that order.[13]
 
 2. Adequate protection
 
 41
 Our determination that the appeal from the April 10, 1992 order was not moot in the district court leads us next to consider the district court's reversal of that order on its merits. As we have indicated, we exercise plenary review of the district court's order which in turn requires us to consider the bankruptcy court's order under the clearly erroneous standard.
 
 
 42
 Section 364(d)(1) of the Code provides that the bankruptcy court may authorize post-petition financing supported by a superpriority lien only if "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." Thus, for the bankruptcy court to have approved First Fidelity's lending money to Swedeland on a superpriority basis, the court had to find that Carteret's interests were adequately protected.
 
 
 43
 A debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection. See In re Grant Broadcasting of Philadelphia, Inc., 71 B.R. 376, 386 (Bankr.E.D.Pa.), aff'd, 75 B.R. 819 (E.D.Pa.1987). See also 11 U.S.C. Sec. 363(o )(1). The Code does not expressly define adequate protection, but section 361 states that it may be provided by (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the "indubitable equivalent" of the secured creditor's interest in such property. 11 U.S.C. Sec. 361. The last possibility is regarded as a catch all, allowing courts discretion in fashioning the protection provided to a secured party. Therefore, a determination of whether there is adequate protection is made on a case by case basis. In re O'Connor, 808 F.2d at 1397.
 
 
 44
 Among the ways a debtor may demonstrate the existence of adequate protection is by supplying the pre-petition lender with a new third-party guaranty or with substitute collateral.[14] These new protections might be sufficient for "[t]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy." Id. at 1396. Accordingly, a proposal depending upon a pre-petition lender having adequate protection, no matter its form, " 'should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights.' " In re Martin, 761 F.2d 472, 476 (8th Cir.1985) (quoting In re American Mariner Industries, Inc., 734 F.2d 426, 435 (9th Cir.1984)). Whether protection is adequate "depends directly on how effectively it compensates the secured creditor for loss of value" caused by the superpriority given to the post-petition loan. In re American Mariner, 734 F.2d at 432. In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing.
 
 
 45
 The bankruptcy court concluded that Swedeland demonstrated that Carteret had adequate protection based upon four factors: (1) Swedeland would turn over to Carteret approximately $1,250,000 in the cash collateral account;[15] (2) Swedeland would pay Carteret future release prices for every unit it sold; (3) the increased value of the Crystal Springs property due to the continued construction; and (4) the continued existence of Carteret's lien and security interest in the Bowling Green Golf Course and the personal guaranties given by Swedeland's principals.[16] The district court ruled that the bankruptcy court's findings were clearly erroneous because Swedeland offered no new consideration to Carteret to offset its diminution of interest as a result of the superpriority lien given to First Fidelity. Accordingly, none of the factors the bankruptcy court enumerated showed Carteret had adequate protection. We agree with the district court.
 
 A. Cash Collateral
 
 46
 The April 10, 1992 order did not provide Carteret with increased protection when it required that the money in the cash collateral account be turned over to Carteret because Carteret was entitled to those monies even without the order. Prior to Swedeland's filing of the Chapter 11 petition, Carteret had a first mortgage on the Crystal Springs property and a lien on the proceeds from the sale of individual residential units. Under the Carteret-Swedeland agreement, Carteret agreed to release its lien on each unit upon the payment by Swedeland of a release price of $42,100 for the unit released. After filing for Chapter 11 protection, Swedeland requested permission to use the cash proceeds from the sale of the units to finance the continued construction of the project. It is these proceeds which we have been terming "the cash collateral." Carteret objected to this application, but the bankruptcy court granted the request.
 
 
 47
 The bankruptcy court, however, recognized Carteret's liens and granted Carteret a continuing lien and security interest in and to all future sales proceeds and all other assets as adequate protection for allowing Swedeland to use the cash collateral to continue construction until December 31, 1991. Accordingly, Carteret previously had been granted a lien on these post-petition proceeds. Therefore, inasmuch as the bankruptcy court already had recognized and granted Carteret a continuing lien on the cash proceeds, it erred in considering those same proceeds to be additional protection permitting the section 364(d) authorization.
 
 B. Release Prices
 
 48
 We reiterate that Carteret's mortgage entitled it to be paid the first $42,100 from the sale of each housing unit as a release price, with $30,000 to be applied to the balance due under the construction loan and $12,100 to be applied to the balance due under the golf course loan. In its post-petition proposal, Swedeland produced six scenarios providing for varying release prices, but only two contemplated Carteret being paid $42,100. Averaging the other four situations, Carteret was to be paid only $28,000 from the proceeds of the sale of each unit. Swedeland justified this reduction in the release price by contending that inasmuch as the Crystal Springs Golf Course was not to be sold and would be generating income, it did not have to be adequately protected. Accordingly, Swedeland believed the proposed release prices did not have to take the golf course into account.
 
 
 49
 The bankruptcy court accepted this proposal to pay reduced release prices on a theory that Swedeland's projections showed that the residential debt could be satisfied. In considering this aspect of the bankruptcy court's decision, the district court indicated that the bankruptcy court "did not explain why the reduced price should be allowed or how the reduced prices would conceivably provide adequate protection to Carteret." While, unlike the district court, we read the bankruptcy court's opinion to set forth an explanation of why the reduced release prices adequately protected Carteret, we reject the explanation. We believe that Swedeland did not provide adequate protection to Carteret by proposing to reduce the payments which would be made to Carteret, particularly in the inherently risky circumstances of this Chapter 11 proceeding.
 
 
 50
 Furthermore, the reductions in the release price could not be justified on a theory that the Crystal Springs Golf Course was not to be sold. There was nothing new in Swedeland's undertaking to retain this asset as the original financing agreement between Swedeland and Carteret did not contemplate a sale of the golf course. Instead, it envisioned that Swedeland would own the course and Carteret's lien against it would be released on the sale of each residential unit. We are at a total loss to understand how a court can suggest that a pre-petition creditor with a lien being subordinated to a superpriority lien can be thought to have adequate protection because an asset encumbered by its lien will remain so encumbered. Of course, Swedeland's argument that the golf course did not have to be adequately protected misses the point for it is the interest of the pre-petition lender, not a particular asset, which must be adequately protected. This principle is demonstrated plainly by the recognition in section 361 that a secured lender may be adequately protected by a replacement lien. At bottom, the record does not support the bankruptcy court's view that the payment of the release price offered Carteret additional protection. Instead Swedeland's proposal placed Carteret in a worse situation than it was in before the Chapter 11 filing.
 
 C. Increased Value of the Property
 
 51
 The bankruptcy court was also wrong in finding that Carteret derived adequate protection from the increased value of the Crystal Springs project through the contemplated continuing construction. As we have indicated, Carteret presented evidence, which Swedeland did not dispute, that the value of the Crystal Springs property was $18,495,000. Under the superpriority lien awarded to First Fidelity, it obtains $3,160,000 before Carteret receives anything. Thus, the only way to justify First Fidelity's superpriority lien based on the value of the property is to show that somehow Carteret's interest in the collateral ($18,495,000) has been increased by $3,160,000. The bankruptcy court apparently believed that the construction of the development and the potential sales increased the value of the property by this amount.
 
 
 52
 Yet, the evidence does not establish that the property has increased in value to compensate Carteret for the loss of its priority to First Fidelity. In the first place, continued construction based on projections and improvements to the property does not alone constitute adequate protection. See Town of Westport v. Inn at Longshore, 32 B.R. 942, 946 (Bankr.D.Conn.1983). Those cases which have considered improvements to be adequate protection have done so only when the improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements. See, e.g., In re O'Connor, 808 F.2d at 1396 (grant of additional, unencumbered collateral); In re 495 Central Park Avenue Corp., 136 B.R. 626 (Bankr.S.D.N.Y.1992) (projected property improvements constituted adequate protection where annual rental income of $180,000 from an existing lease conditioned on improvements would increase value of real estate securing pre-petition loan by at least $800,000, and superpriority post-petition loan financing the projected improvements amounted to only $650,000). We reject the notion that development property is increased in value simply because a debtor may continue with construction which might or might not prove to be profitable.
 
 
 53
 Neither does the possibility of selling the units show that the value of the property has increased to protect Carteret adequately.[17] Indeed, as the district court pointed out, Swedeland's projections concerning how many units it will sell were belied by its historical performance. Swedeland already had defaulted on the loan to Carteret, the five-month sales projections for the period between August through December 1991 were below expectations, and the cash flow projections upon which the bankruptcy court relied were deficient as they did not provide for a reasonable developer's profit nor discount the projected eight-year cash flow to present value. In fact, the testimony showed that discounting would yield only a net present value of $14,340,303. The district court correctly found that this amount was insufficient to protect Carteret adequately. In this regard, we cannot resist pointing out that we do not doubt that Swedeland's original projections certainly could not have contemplated that within 28 months of acquiring the Crystal Springs property it would file a Chapter 11 petition.
 
 
 54
 D. Personal Guarantees and Mortgage on Bowling Green
 
 
 55
 Finally, the bankruptcy court erred in concluding that the continued existence of the personal guarantees and the mortgage on the Bowling Green property constituted adequate protection. As with the cash collateral, Carteret was entitled to these anyway. Moreover, the lien on Bowling Green is worth only $6,715,000. Thus, even without the superpriority lien reducing Carteret's interest, this collateral undersecured Carteret.
 
 
 56
 In sum, even under the clearly erroneous standard, the district court correctly rejected the bankruptcy court's finding that there was adequate protection justifying the superpriority financing. It is clear that Swedeland failed to offer anything significant that would adequately protect Carteret. The law does not support the proposition that a creditor, particularly one like Carteret undersecured by many millions of dollars, may be adequately protected when a superpriority lien is created without the provision of additional collateral by the debtor. Based on all the above, the bankruptcy court erred in authorizing the post-petition financing on a superpriority basis.
 
 
 57
 We cannot close this portion of our opinion without pointing out that what happened here is quite disturbing. There, of course, is no doubt that the policy underlying Chapter 11 is quite important. Nevertheless, Congress did not contemplate that a creditor could find its priority position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects. We trust that in the future bankruptcy judges in this circuit will require that adequate protection be demonstrated more tangibly than was done in this case.
 
 3. Relief from the Automatic Stay
 
 58
 Carteret moved for relief from the automatic stay pursuant to section 362(d). That section provides that relief from the stay should be granted:
 
 
 59
 (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
 
 
 60
 (2) with respect to a stay of an act against property ..., if--
 
 
 61
 (A) the debtor does not have an equity in such property; and
 
 
 62
 (B) such property is not necessary to an effective reorganization.
 
 
 63
 Inasmuch as there is no equity in the property, Swedeland had the burden to prove that the property was necessary to an effective reorganization to maintain the automatic stay. But it had to do more than make a mere assertion to that effect or show that "there is conceivably to be an effective reorganization." United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 375, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988). Rather, it had to show "that the property is essential for an effective reorganization that is in prospect." Id. at 376, 108 S.Ct. at 633 (emphasis in the original). From this requirement, it follows that "[i]f no reorganization of the debtor is feasible, then no property of the debtor can be necessary for that end." In re Dublin Properties, 12 B.R. 77, 80 (Bankr.E.D.Pa.1981). The district court correctly found that Swedeland did not make a showing that an effective reorganization is in prospect.[18]
 
 
 64
 The bankruptcy court concluded that Swedeland had the ability to reorganize because: (1) it demonstrated post-petition performance in accordance with its projections; (2) it obtained a commitment for post-petition financing; (3) it established that in eight years it could build out the project and satisfy Carteret's lien; (4) the projections were based on the historical costs of another project, Swedeland had been on target to date and its projections were credible; and (5) Swedeland had not acted in bad faith.
 
 
 65
 But Swedeland had fallen short on its sales projections. Furthermore, its ability to obtain post-petition financing should not be considered, inasmuch as that authorization was inappropriate and, with respect to First Fidelity, the larger source of financing, has been set aside. We will not hold that a debtor can achieve an effective reorganization by diminishing the value of its pre-petition creditor's lien interest. We also point out that Swedeland's evidence at the bankruptcy court hearing indicated that it could not obtain any financing except on a superpriority basis. As the attempt to obtain that financing should not have been successful, and now has been terminated, Swedeland cannot continue building. Additionally, Swedeland did not refute Carteret's evidence showing that the net present value of Swedeland's projected cumulative cash flow would be insufficient to satisfy Carteret's secured claim. Thus, there was no prospect of an effective reorganization in this case.
 
 
 66
 There is another reason why an effective reorganization was not in prospect. We recently held that the deficiency claim of an undersecured mortgagee could not be classified separately from the claims of other unsecured creditors of the debtor, and therefore when the mortgagee opposed the plan, there was "no reasonable prospect of confirmation" of a plan. John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Assocs., 987 F.2d 154, 161 (3d Cir.1993). Here Carteret is undersecured by approximately $20 million.[19] The remaining unsecured claims against Swedeland in the aggregate are far less than that amount.[20] Thus, Swedeland cannot receive the necessary affirmative vote of the class of unsecured creditors without Carteret's acceptance of the plan. See 11 U.S.C. Sec. 1126(c) requiring acceptance by two-thirds in amount of claims in a class of interests.
 
 
 67
 Carteret asserts that it will oppose any proposed plan and cannot foresee that Swedeland will make any proposal which it would consider acceptable. Thus, for this reason alone, an effective reorganization of Swedeland is not realistically possible. Accordingly, the district court properly found the Swedeland has not carried its burden to prove that the property is necessary to an effective reorganization that is in prospect.
 
 IV. CONCLUSION
 
 68
 For the reasons set forth above, we will vacate the order of September 17, 1992, of the district court to the extent that it reversed the order of the bankruptcy court of March 6, 1992, and will remand the case to the district court so that it can dismiss the appeal from that order. We will affirm the order of the district court of September 17, 1992, to the extent that it reversed the orders of the bankruptcy court of March 9 and April 10, 1992, and will remand the matter to the district court so that it in turn may remand the matter to the bankruptcy court which then will vacate its orders of March 9 and April 10, 1992, and will enter an order granting Carteret relief from the automatic stay so that it may proceed with a foreclosure action.
 
 
 
 [1]
 The Resolution Trust Company is the conservator for Carteret but inasmuch as there are no special issues in this case attributable to its presence, as a matter of convenience we will omit further reference to it
 
 
 [2]
 The agreement provided for a loan of $51,800,000, but the outstanding balance was not to exceed $37,000,000
 
 
 [3]
 The district court also indicated that Carteret was entitled to relief from the automatic stay under 28 U.S.C. Sec. 362(d)(1) as it did not have adequate protection. We need not address that aspect of its opinion as we are satisfied that Carteret was entitled to relief under section 362(d)(2). Thus, we do not consider how an adequate protection analysis under section 362(d)(1) could differ from an adequate protection analysis under section 364(d)
 
 
 [4]
 The orders of the bankruptcy court were final so that the district court had jurisdiction under 28 U.S.C. Sec. 158(a) without granting leave to Carteret to appeal. While Swedeland suggests that the order denying relief from the automatic stay was interlocutory in the district court, we reject that contention. See John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Assocs., 987 F.2d 154, 157 (3d Cir.1993); Matter of West Electronics Inc., 852 F.2d 79, 82 (3d Cir.1988) (order denying motion to lift stay final because in bankruptcy court's view, moving party was not entitled to relief when it filed its motion)
 
 
 [5]
 As we will demonstrate below, we can perceive of no relief which can be granted Carteret from a reversal of the March 6, 1992 order, and therefore the appeal from it may have been moot in the district court on Article III constitutional grounds as well as on statutory and prudential grounds. See North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). However, inasmuch as we conclude that that appeal was moot in the district court for the latter reasons we have no need to make a separate constitutional analysis of that order. On the other hand a contention that the appeal from the April 10, 1992 order was constitutionally moot would not be substantial
 
 
 [6]
 In its brief, Swedeland discusses 11 U.S.C. Sec. 363(m), which provides in language similar to that in section 364(e) that the reversal or modification on appeal of an authorization for the sale or lease of property does not affect the validity of a sale or lease under such authorization to a good faith purchaser or lessee absent a stay pending appeal. The reference is not particularly helpful because a consideration of whether a successful appellant can be granted effective relief upon the reversal of an order depends on the circumstances in each case. Obviously it might be more difficult to fashion effective relief in the case of a completed and unassailable sale or lease of a property than in a case involving a loan in which the transaction is partially executory
 
 
 [7]
 Having rejected the contention that by force of section 364(e) alone an appeal is moot if a stay is not granted, we can conceive of no reasonable argument that an appeal can be moot on general mootness principles before a post-petition lender makes any disbursement if a stay is not granted. After all if, as is the case, a post-petition lender who makes no disbursement is not protected if a stay is granted, it is an order of a court following the entry of the section 364(d) order that deprives the lender of that protection. We cannot imagine why an order of reversal prior to the disbursement of funds should in this respect have less effect than an order for a stay. In this regard, we acknowledge that while an application for a stay usually would be made promptly after entry of a section 364(d) order, there is no time limit in section 364(e) when the stay can be sought or granted so that a reversal or modification can affect what otherwise would be a superpriority lien
 
 
 [8]
 We are not suggesting that in every case a reversal of a section 364(d) financing order will lead to the barring of all further disbursements by the post-petition lender. It is possible that the lender's initial disbursements might have left a particular facility uncompleted so that additional funds would be required to protect the disbursements made before the reversal. While it is obvious that First Fidelity did not need such protection as its superpriority lien would have been secured adequately even if the 19 units under construction had not been finished, we nevertheless think that the district court's partial stay demonstrates the common sense approach to be followed after the reversal of a 364(d) order
 
 
 [9]
 Obviously these cases also would give support to the conclusion that the appeal from the March 6, 1992 order is moot, but we need not consider them in that context as we are holding that appeal moot because we can conceive of no effective relief which could be granted to Carteret upon the reversal of that order
 
 
 [10]
 Swedeland also relies on In re Joshua Slocum Ltd., 922 F.2d 1081, 1085 (3d Cir.1990), and In re Highway Truck Drivers & Helpers Local Union No. 107, 888 F.2d 293, 297 (3d Cir.1989). In Slocum we set forth that section 364(e) is only one of two provisions in the Bankruptcy Code that "specifically require that a party seek a stay pending appeal" and in Local 107 we indicated that section 364(e) was one of "only two statutory provisions in the Bankruptcy Code where a stay is specifically required to preserve a position pending appeal." These cases do not help Swedeland as they were made in the context of appeals from orders under sections of the Code in which stays pending appeal were not required specifically. Thus, Slocum and Local 107 cited section 364(e) to contrast it to those other sections. There is, of course, no doubt that under section 364(e) a stay is required, except in cases in which the post-petition lender makes no disbursements before the district court decides the appeal on the merits, if the party appealing from a section 364(d) order seeks to preserve its position completely. What we are holding is that Carteret's failure to obtain the stay does not bar the court from granting it any relief from the April 10, 1992 order. There is nothing in that holding inconsistent with Slocum or Local 107
 
 
 [11]
 Carteret does not make a contrary contention in its brief, and at the argument before us its attorney conceded that the Haylex monies had been expended at least by that time
 
 
 [12]
 Of course, it is not conceivable that a bankruptcy court would authorize creation of a section 364(d) superpriority lien on an asset and simultaneously permit a pre-petition lender to foreclose on the same asset
 
 
 [13]
 While we have not suggested that the appeal from the March 6, 1992 order was moot simply because all of the funds in the Haylex loan were advanced and apparently spent before the reversal, the cases we cite seem to be unanimous that an appeal is moot in that situation. See, e.g., In re Blumer, 66 B.R. at 113. Thus, our analysis goes beyond that made in other cases
 
 
 [14]
 Obviously we are not suggesting that in all cases a third-party guaranty would be sufficient. The sufficiency of the guaranty would depend, inter alia, on the financial strength of the guarantor
 
 
 [15]
 The district court noted that in fact on or about April 1, 1992, Swedeland turned over $988,818.74, and there was no indication the balance had been paid
 
 
 [16]
 In addition, the bankruptcy court found that Swedeland's obligation to supply Carteret with regular reports and the court's intention to conduct a status conference in seven months contributed to Carteret's adequate protection. While we do not doubt that such procedural steps would be helpful to a pre-petition creditor, we do not regard them as substitutes for the more concrete items listed in section 361. To put it bluntly, Carteret could not convert them into cash
 
 
 [17]
 Swedeland relies on In re Snowshoe Co., 789 F.2d 1085 (4th Cir.1986), for the proposition that "[o]perating projections may serve as a valid basis of adequate protection." But in that case the operating projections related to the debtor's ability to pay the superpriority loan which, as here, was much smaller than the subordinated debt. Furthermore, in Snowshoe the pre-petition creditor, unlike Carteret, had a secured loan for considerably less than the value of the property. We do not, however, imply by this observation that a creditor no matter how great its security can be adequately protected without receiving additional collateral or guarantees if the creation of a superpriority lien decreases its security. Of course, in this case unlike the debtor in Snowshoe, Swedeland is attempting to use operating projections to establish adequate protection of the pre-petition lien
 
 
 [18]
 The court used the word "progress." We are confident it meant "prospect."
 
 
 [19]
 Even if the Bowling Green property is taken into account, Carteret is undersecured by over $13,000,000
 
 
 [20]
 According to the bankruptcy judge's opinion, the unsecured creditors other than Swedeland shareholders were owed $2,695,389. The shareholders were owed approximately $737,000