In re **CLINTON STREET FOOD CORP.,** Penco Supermarkets, Inc., Grandco Food Corp., Penco Food Corp., Trenco Food Corp., Debtors.

**WHITE ROSE FOOD, White Rose Dairy, Divisions of Di Giorgio Corporation and W.R. Service Corp., Appellants,**

v.

**GENERAL TRADING CO., INC.,** Ian J. Gazes, Chapter 7 Trustee of the Estates of Clinton Street Food Corp., Penco Supermarkets, Grandco Food Corp., Penco Food Corp., Trenco Food Corp., et al., Appellees.

No. 94 Civ. 1009 (RWS).

United States District Court, S.D. New York.

July 20, 1994.

Finkel Goldstein Berzow & Rosenbloom (Harvey L. Goldstein, Michael L. Carey, Gary I. Selinger, of counsel), New York City, for appellant White Rose.

John S. Pereira, New York City, for appellee General Trading Co., Inc.

## OPINION

SWEET, District Judge.

Appellants White Rose Food and White Rose Dairy, Divisions of Di Giorgio Corporation and W.R. Service Group (collectively, "White Rose") appeal an order dated July 15, 1993, of the Honorable James L. Garrity, Jr., Bankruptcy Judge of the United States Bankruptcy Court for the Southern District of New York (the "Financing Order"), which, *inter alia,* granted General Trading Co., Inc. ("General") a superpriority lien under § 364 ("Section 364") of the Bankruptcy Code in all inventory, leasehold interests, and other assets of each of the four debtors Clinton Street Food Corp. ("Clinton"), Grandco Food Corp. ("Grandco"), Penco Food Corp. ("Penco"), and Trenco Food Corp. ("Trenco" and, collectively with the other debtors, the "Debtors"). In addition, White Rose appeals from an order, dated December 23, 1993 and entered February 10, 1994, denying its motions to amend the Financing Order, and from an order dated March 4, 1994, authorizing payment of General's superpriority lien. For the reasons set forth below, these appeals are dismissed as moot.

## Parties

The Debtors formerly operated four supermarkets in New York City. Trenco and Penco leased and operated supermarkets in the Bronx, while Clinton and Grandco leased and operated supermarkets in Manhattan. Ian Gazes was appointed Interim Trustee of the Debtors by order dated October 18, 1993.

White Rose is a wholesale distributor of food and other grocery products to supermarkets operating under various names. Between 1989 and 1993, White Rose was the principal wholesale supplier of food products to Trenco and Penco. White Rose also supplied products to Clinton and Grandco. As a result of White Rose's sales of grocery products to the Debtors, and of various loans made by White Rose to Trenco and Penco, White Rose is allegedly owed a total of $1,817,196.81 plus interest.

General is also a wholesale supplier of goods and grocery products, and was the principal wholesale supplier for Clinton and Grandco. General was allegedly owed in excess of $2,200,000.00 by the Debtors as of the filing date in bankruptcy.

## Facts

Both White Rose and General Trading are alleged to be secured creditors, White Rose holding the senior secured position in the two Bronx stores owned by Trenco and Penco, and General holding the senior secured position in the two Manhattan stores owned by Grandco and Clinton Street.

Simultaneous with the Debtor's June 17, 1993 Chapter 11 filing, the Debtors moved for an order, pursuant to § 364(d) of the Bankruptcy Code,[1] authorizing approval of a debtor-in-possession Loan and Security Agreement with General dated June 16, 1993 (the "DIP Financing Agreement").

In its application for DIP financing (the "Application"), the Debtors asked for permission to borrow an additional $500,000.00 in the form of merchandise trade credits from General (the "DIP Credits"), to be collateralized by a superpriority lien on the assets of all of the Debtors. The Application stated that the leasehold interests for their four supermarkets had a value of between $3.6 million and $6.8 million, and thus were worth substantially more than the security interests held by White Rose and General.

The Bankruptcy Court entered an order authorizing interim DIP financing on June 18, 1993. On July 15, 1993, the Court issued the Financing Order approving DIP financing over White Rose's objections. This Order granted General Trading a superpriority lien in all of the Debtors' assets as follows:

> ORDERED, that as security for such DIP Loans, pursuant to Section 364(d)(1) of the Bankruptcy Code, General Trading is hereby granted superpriority liens in all inventory, leasehold interests, and other assets of each of the Debtors (excluding the Excluded Leased Equipment), which liens shall be senior to all other security interests, liens, claims and encumbrances of any kind, and which shall be deemed fully perfected without the requirement of any filing or further action....

Pursuant to the Financing Order, General has the right to look to the first available source of funds arising out of the liquidation of the Debtors' assets to satisfy its superpriority lien. To prevent weakening White Rose's pre-petition secured status arising from General's superpriority lien, the Bankruptcy Court granted White Rose a $241,000.00 replacement lien in the Trenco leasehold.

General has documented the allocation of its DIP Credits among the four supermarkets as follows. Grandco received a total of $143,725.19 in Credits; Clinton received a total of $140,011.12 in Credits; Penco received a total of $119,911.06 in Credits, and Trenco received a total of $106,989.01 in Credits.

---

1. This section provides:

   The court, after notice and hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

   (A) the trustee is unable to obtain such credit otherwise; and

   (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

The Chapter 7 Trustee sold the Trenco lease and personalty for approximately $570,-000 plus $16,000 for inventory. From the proceeds, the Trustee will pay his commission of $17,500.00 and fees; $147,604.03 as a cure for the Trenco defaults, leaving approximately $400,000 to be distributed to creditors from the sale.

The Penco assets were sold for $330,-000.00. The sum of cure payments to Penco's landlord, plus the Trustee's expenses, are estimated to exceed $113,000.00.

The Grandco assets were purchased by General on behalf of its designee, 545 Grand Food Corp., through a bid in of its pre-petition lien, in the amount of $505,000.00. The Clinton Street assets were purchased by General for its designee, Ferro Food Corp. General bid its pre-petition lien for $745,-000.00.

### Prior Proceedings

On June 17, 1993, the Debtors filed voluntary petitions for relief, under Chapter 11 of the Bankruptcy Code. By order dated June 21, 1993, the cases were consolidated for procedural purposes only. For approximately four months, the Debtors operated their business and managed their properties as debtors-in-possession pursuant to §§ 1107 and 1108 of the United States Bankruptcy Code. By order dated October 15, 1993, the Debtors Chapter 11 cases were converted into cases under Chapter 7.

White Rose moved, pursuant to Rule 59(e), Fed.R.Civ.P., to alter or amend the Financing Order on July 28, 1993. In the Rule 59(e) motion, White Rose asked the Court to alter or amend the Financing Order to provide that the superpriority lien granted to General would be subject to the doctrine of marshalling of assets, such that it would attach first to the leasehold, fixtures, and inventory of the Manhattan stores, then to the inventory of the Bronx stores, and only thereafter to the leaseholds and fixtures of the Bronx stores; that the superpriority lien granted to General would be limited to the Credits given to the separate and distinct Debtors' estates, as estimated by the Debtors to be approximately $125,000.00 for each of the four supermarkets; and that, upon the sale of any of the four Debtors' assets the amount of the superpriority lien to be repaid to General would be limited to the extent of actual merchandise advanced to that particular debtor.

Before the hearing on the Rule 59(e) Motion, White Rose moved for modification of the Financing Order pursuant to Rule 60(b)(6), Fed.R.Civ.P. This motion requested that the Financing Order be modified and/or clarified to provide that all proceeds from the sale or liquidation of the Debtors inventory would be paid in their entirety to General, in satisfaction of its DIP Credits, and that if proceeds from the sale of the Debtors' inventory proved insufficient to satisfy General's DIP Credit advances, payment of the balance of such advances would be allocated to, and paid from, the proceeds of sale of the leaseholds of each of the four Debtor corporations on a *pro rata* basis, based on the sale prices of the four leaseholds.

On December 23, 1993, the Bankruptcy Court denied both of White Rose's motions. On March 4, 1994, Judge Garrity issued an order authorizing payment of General's superpriority lien. White Rose appealed from the Financing Order and Judge Garrity's order denying its motions to clarify or alter the Financing Order on January 3, 1994, and appealed from Judge Garrity's order authorizing payment of the superpriority lien on March 14, 1994, which appeals were consolidated by order of this Court dated June 7, 1994. Argument was heard on June 8, 1994, and these appeals were considered fully submitted as of that date.

### Discussion

■ Section 364(e) provides that:

The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

The purpose of this section is to overcome parties' reluctance to lend to a bankrupt firm by assuring them that, so long as they are relying in good faith on a bankruptcy judge's approval of the transaction, they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge. *In re Pan Am Corp.,* 1992 WL 154200, at *1–2, 1992 U.S.Dist. LEXIS 8396, at *4 (S.D.N.Y. June 17, 1992); *In re EDC Holding Co.,* 676 F.2d 945, 947 (7th Cir.1982).

■ Where a lender extended credit in good faith under Section 364, and the authorization appealed from has not been stayed, the proper course is to dismiss an appeal as moot. *In re Pan Am Corp.,* 1992 WL 154200, at *6–7, 1992 U.S.Dist. LEXIS 8396, at *21; *In re Texaco, Inc.,* 92 B.R. 38, 51–52 (S.D.N.Y.1988); *see also In re Swedeland Dev. Gr., Inc.,* 16 F.3d 552, 563 (3d Cir.1994) (*en banc*); *In re Graphic Arts Lithographers, Inc.,* 71 B.R. 774, 777 (Bankr. 9th Cir.1987); *In re Revco D.S.,* 901 F.2d 1359, 1364 (6th Cir.1990).

■ There is no allegation in this case that General or any other party acted in bad faith in connection with the Financing Order. (*See* 12/23/93 Tr. at 30.) It is uncontested that no stay pending appeal of the Financing Order was ever obtained. The Bankruptcy Court held, on the basis of these facts, that White Rose's motions to amend or clarify the Financing Order "must be denied as moot." (12/23/93 Tr. at 30.)

White Rose contends that dismissal for mootness is not appropriate in the present case for a variety of reasons. Initially, White Rose argues that it does not challenge the making of the DIP Financing loans, and does not seek to invalidate the superpriority status of the lien given to General, but merely seeks to alter the method of repayment of those loans, and thus Section 364(e) is not applicable.

A similar argument was raised in *In re Texaco,* in which a post-petition financing agreement authorized pursuant to Section 364 contained an acceleration clause triggered upon a change of control of the debtor's then-existing management. The appel-

lants argued that since they did not seek to disturb the validity of the financing agreement or the security interests granted thereunder, but only to alter the change-in-control clause, Section 364(e) did not apply.

This Court rejected this "crabbed reading of section 364(e)" as inconsistent with congressional intent. There was extensive testimony in the record that the financing agreement would not have been consummated without the change-in-control clause, and that this clause was part of the bargained-for consideration for the post-petition financing.

In this case, the provisions for collateralization of the DIP financing was an integral part of the bargained-for consideration for that financing. (*See, e.g.,* 12/10/93 Tr. at 41 (noting that General would not have made post-petition loans without the collateralization arrangements).) Section 364 is not susceptible to the "crabbed" interpretation that would exclude protection of General's bargained-for collateralization provisions.

■ White Rose also argues that this appeal is not moot because this Court could provide effective relief by modifying the Financing Order to provide that General's loans be repaid by the four Debtors on a pro-rata basis, or by applying the equitable doctrine of marshalling of assets to the repayment of General's post-petition loan. In this argument, White Rose relies on the recent *en banc* opinion of the Third Circuit in *In re Swedeland Development Group, Inc.*

*Swedeland* involved two orders of a bankruptcy court approving post-petition financing under Section 364. Under the first, March 6 Order, $840,000 was immediately disbursed to the debtor, which thereafter expended the proceeds for working capital. Under the second, April 10 Order, the Bankruptcy Court authorized the debtor to borrow up to $3,160,000 on a revolving basis.

With regard to the April 10 Order, the Third Circuit held that "to the extent that the loan was disbursed, the validity of the debt incurred and the priority of the superpriority lien securing it cannot be affected." *Swedeland,* 16 F.3d at 560. With respect to the March 6 Order, the Court held that, as

the funds authorized under this Order had already been disbursed, there was no relief that could be granted consistent with Section 364(e), because such relief "would impair the security for which [the lender] bargained and thus would be inconsistent with the protection afforded it by section 364(e)." The Circuit Court determined that the appeal from the March 6 Order was therefore moot. *Swedeland,* 16 F.3d at 563.

The only portion of the appeal that was not moot in *Swedeland* related to that portion of the revolving loan that had not yet been disbursed. With respect to these funds, the Circuit Court held that the District Court could reverse the financing order and prohibit the further advancement of funds, since Section 364(e) does not protect a post-petition lender's expectations of being able to make contemplated future loans. *Swedeland,* 16 F.3d at 561.

In the present case, the DIP Credits have already been dispersed to the debtors. As was the case in *Swedeland,* the Financing Order cannot be altered in the manner that White Rose suggests without impairing General's bargained-for collateral, which is prohibited by Section 364(e).

■ White Rose also claims that the Financing Order effected a cross-collateralization of General's pre-petition loans, and that therefore this appeal is not moot under the holding of the Eleventh Circuit in *In re Saybrook Manufacturing Co.,* 963 F.2d 1490 (11th Cir.1992). In *Saybrook,* the post-petition lender had a pre-petition claim against the debtor for $34 million dollars, the collateral for which was worth less than $10 million dollars. In exchange for an additional post-petition loan of $3 million dollars, the lender received a security interest in all of the debtor's property that protected not only the $3 million dollars in post-petition loans, but also the $34 million dollars in pre-petition loans.

The Eleventh Circuit held that cross-collateralization was not authorized under Section 364, and therefore the appeal was not moot under that Section. The applicability of *Saybrook* in this Circuit need not be considered, however, because no cross-collateralization occurred in this case.

The Financing Order and the superpriority lien relate only to post-petition lending by General. The Order does not grant General a security interest in any assets, pre- or post-petition, to secure General's pre-petition indebtedness. Any seeming advantage to General's pre-petition claims arising from the DIP Financing Agreement are the result of the unexpectedly low price received for the Debtors' assets and of the order in which the Debtors' assets were liquidated.

■ White Rose's argument, based on *In re Sun Runner Marine, Inc.,* 945 F.2d 1089, 1095 (9th Cir.1991), that Section 364(e) does not protect General's post-petition loans is frivolous. In *Sun Runner,* the order appealed from authorized the debtor to assume, under 11 U.S.C. § 365, an agreement which required, among other things, the debtor to cure all defaults, paying pre-petition and post-petition interest charges. On appeal, the Ninth Circuit found the agreement one of "financial accommodation," and thus unassumable under Section 365(c)(2). The Ninth Circuit found that the appeal was not moot under Section 364(e) because:

> Section 364(e) explicitly applies only to "an authorization *under this section* to obtain credit or incur debt, or ... a grant *under this section* of a priority or a lien." Transamerica sought and the bankruptcy court ordered the cure payments under § 365, not § 364, and therefore those payments are not protected by § 364(e).

*Sun Runner,* 945 F.2d at 1095.

Little needs to be said with respect to White Rose's reliance on *Sun Runner* except that, in this case, the super-priority lien in question was granted under Section 364, and hence is subject to that Section's protections.

■ Likewise, White Rose argues that the Financing Order had the effect of substantively consolidating the four Debtors' estates, citing *In re Augie/Restivo Baking Co.,* 860 F.2d 515 (2d Cir.1988). The truth of this proposition need not be considered because, in contrast to *Saybrook* which found cross-collateralization unauthorized under the Bankruptcy Code, *Augie/Restivo* discusses the circumstances under which substantive

consolidation is appropriate. Even if the Financing Order did effect a substantive consolidation of the Debtors' estates, such a result is not forbidden, and thus the Order would be protected by .364(e).

### Conclusion

For the reasons discussed above, White Rose's appeal is dismissed as moot.

It is so ordered.