

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-31-1996

# In Re: Continental

Precedential or Non-Precedential:

Docket 94-7748

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"In Re: Continental" (1996). *1996 Decisions.* Paper 142.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/142

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
_____

No. 94-7748
_____

IN RE CONTINENTAL AIRLINES:

NATIONSBANK OF TENNESSEE, N.A., f/k/a NationsBank of Tennessee,
 as Collateral Trustee under a Secured Equipment Indenture and
Lease Agreement dated March 15, 1987 ("NationsBank"); NEW JERSEY
 NATIONAL BANK, as successor by merger to Constellation Bank,
N.A., f/k/a National State Bank of Elizabeth, N.J.; HARRIS TRUST
AND SAVINGS BANK; and BOATMAN'S FIRST NATIONAL BANK OF OKLAHOMA,
     as First, Second and Third Priority Secured Equipment
  Certificates Trustees thereunder, respectively (the "Series
 Trustees" and, collectively with NationsBank, the "Trustees"),
                                                     Appellants
                      _____

        On Appeal from the United States District Court
               for the District of Delaware
                  C.A. No. 93-195-JJF
            (Bankruptcy Nos. 90-932 through 90-984)
                      _____

                Argued September 15, 1995

             Before:  SLOVITER, Chief Judge,
             ALITO and SEITZ, Circuit Judges

             Reargued in banc May 14, 1996

   Before:  SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN,
        GREENBERG, SCIRICA, COWEN, NYGAARD, ALITO, LEWIS,
          MCKEE, SAROKIN and SEITZ, Circuit Judges

                (Filed July 31, 1996)
                      _____

Gary S. Jacobson (Argued)
Nicholas J. DiCarlo
James G. Scotti
Kelley Drye & Warren
New York, NY 10178

        Attorneys for Appellant NationsBank
        of Tennessee

Hal L. Baume
Louis T. DeLucia
Norman Peer
Wilentz, Goldman & Spitzer

Woodbridge, NJ 07095

Attorneys for Appellant New Jersey
National Bank

Richard G. Elliott, Jr.
Daniel J. DeFranceschi
Richards, Layton & Finger
Wilmington, DE  19899

Attorneys for Appellants Harris Trust
and Savings Bank and Boatman's First
National Bank of Oklahoma


Richard P. Schifter  (Argued)
Andrew T. Karron
Michael L. Bernstein
Kari M. Desgalier
Arnold & Porter
Washington, D.C. 20004

Laura D. Jones
Robert S. Brady
Young, Conaway, Stargatt & Taylor
Wilmington, DE  19899-0391

Attorneys for Appellee

_____

OPINION OF THE COURT
_____

SLOVITER, Chief Judge.

### INTRODUCTION

Before the in banc court is an appeal by NationsBank of Tennessee (Collateral Trustee) and New Jersey National Bank, Harris Trust and Savings Bank, and Boatman's First National Bank of Oklahoma (First, Second, and Third Priority Secured Equipment Certificate Trustees), who are collectively referred to in this opinion as the "Trustees," from the order entered by the district court in the Chapter 11 bankruptcy proceeding of Continental Airlines, Inc. dismissing as "moot" three appeals by the Trustees.  Those appeals were from orders of the bankruptcy court which 1) denied the Trustees' Renewed Motion for adequate protection, 2) confirmed Continental's revised second amended joint plan of reorganization, and 3) denied the Trustees' motion for the establishment of a cash deposit of $123,479,287.  In essence, the Appellant Trustees seek payment for an asserted administrative claim of approximately $117 million against the reorganized company.  The Appellee, Continental Airlines, Inc., defends the district court's decision to dismiss the Trustees' appeal and argues, in the alternative, that the underlying

rulings of the bankruptcy court were correct as a matter of law and fact.

I.

FACTUAL AND PROCEDURAL HISTORY

Continental filed its Chapter 11 bankruptcy petition on December 3, 1990.  Appellant Trustees serve as successor Collateral and Series Trustees for certificate holders who had provided Continental with operating capital.  The certificates were secured at the time of Continental's petition by a pool of 29 commercial aircraft with engines, and 81 additional jet engines which, we were advised, serviced about one-third of Continental's operating fleet.  Under the Bankruptcy Code, the debtor in possession, which has most of the rights, powers, functions and duties of a trustee, see 11 U.S.C.  1107(a), "may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C.  363(c)(1).

Section 363(e) provides:
Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used . . . by the [debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest.
11 U.S.C.  363(e).

On February 21, 1991, First Fidelity Bank of New Jersey, predecessor to NationsBank as Collateral Trustee, filed a motion along with many other aircraft lessors and financiers alleging, inter alia, a decline in the value of the collateral and seeking adequate protection under section 363(e).  First Fidelity later withdrew from this motion, but on June 28, 1991 it, and the predecessors of the other Appellant Trustees, filed a motion seeking similar relief.  The bankruptcy court held an evidentiary hearing on the motion from September 3 through September 6, 1991 limited to the Trustees' assertion that they were entitled to adequate protection payments as a result of the collateral's post-petition decline in market value.

Continental argued, inter alia, that because the Trustees had not filed a motion for relief from the automatic stay, they were not entitled to an award of adequate protection under section 363(e).  The motion remained pending in the bankruptcy court until August 27, 1992 when the court ruled on the Trustees' motion, rejecting Continental's legal argument but finding as a fact, based on the "Blue Books," a publication issued by a company that appraises aircraft, that the market value of the collateral had not declined during the period at issue in the motion.  In re Continental Airlines, Inc., 146 B.R. 536 (Bankr. D. Del. 1992) [hereinafter Continental I].

Approximately two weeks before the bankruptcy court issued that opinion, the Trustees filed their first motion under section 362(d) of the Bankruptcy Code to lift the automatic stay ("Lift-Stay Motion").  See 11 U.S.C.  362(d).  This section permits a creditor to move for relief from the automatic stay of delineated activities, such as repossession of collateral, effected by section 362(a) of the Bankruptcy Code.

On September 14, 1992, the Trustees also filed a renewed motion for adequate protection for alleged decline in the collateral's value for the period after September 1991, when the original 1991 motion was argued ("Renewed Motion"). There were various hearings on the Renewed Motion between November 3, 1992 and February 5, 1993. Toward the end of that period, the Trustees filed a motion dated January 29, 1993, asking the bankruptcy court to establish a cash deposit of some $123 million, of which $117 million was attributable to alleged market decline, to preserve what the Trustees claimed was the administrative priority status of the Trustees' adequate protection claim if Continental emerged from bankruptcy as a reorganized debtor ("Deposit Motion").

During this period efforts to reorganize the debtor continued. On November 9, 1992 Continental entered into an Investment Agreement under which the Investors (Air Partners, L.P. and Air Canada) agreed and committed to an investment of $450 million in the reorganized entity under a complex arrangement and subject to certain conditions. App. at 391 et seq. One of those conditions, and the one most relevant to this proceeding, was a limitation on the amount and nature of liabilities and administrative expense claims required to be assumed by or attributable to the reorganized company. App. at 408. On January 13, 1993 Continental filed a second amended joint plan of reorganization ("Plan") which referenced that Investment Agreement. The Plan provided, inter alia, for assumption of "allowed administrative claims" by the reorganized Continental. App. at 656.

The confirmation hearing was held for a number of days during the period March 16, 1993 through April 16, 1993. The parties reached a settlement on April 12 concerning adequate protection due to use and/or maintenance of the collateral by Continental, and no issue relating to use decline (the impairment in value attributable to the use of the collateral by the debtor in possession) is before us. However, the parties did not settle the Trustees' adequate protection claims based on decline in market value.

At the conclusion of the confirmation hearing on April 16, 1993, the bankruptcy court denied the Deposit Motion and the Renewed Motion. In a published opinion, the bankruptcy court held that it was necessary for the Trustees to have sought relief from the automatic stay to be entitled to adequate protection for market value decline; that therefore the Trustees were not entitled to adequate protection due to market decline until after the date of their Lift-Stay Motion, i.e. August 14, 1992; and that no decline in the market value of the collateral had taken place since that date. In re Continental Airlines, Inc., 154 B.R. 176 (Bankr. D. Del. 1993) [hereinafter Continental II]. Also on April 16, 1993, the bankruptcy court signed the Confirmation Order. The court made a series of detailed findings of fact and conclusions of law underlying the Confirmation Order which will be referred to throughout this opinion when pertinent.

On April 20, 1993 the Trustees filed three notices of

appeal to the district court from the bankruptcy court's denial of the Renewed Motion for Adequate Protection, its denial of the Deposit Motion, and its order confirming the Plan. Two days later, the Trustees filed a motion for a partial stay of the consummation of the Plan ("Conditional Stay Motion"), but filed that motion in the district court, which referred them to the bankruptcy court. On April 26, 1993, the Trustees filed that stay request in the bankruptcy court. Because the bankruptcy judge was not available, the hearing on the motion was held the next day in the district court, which stated, without explanation or analysis, that the Trustees were likely to prevail on their appeal to the district court, but denied the stay because the

Trustees were "unable to post a bond satisfactory to the Court." App. at 1755-56. The Trustees did not then make any effort to seek any emergency relief from this court. With no stay impeding implementation of the Plan which had now been confirmed, the Investors proceeded to close the transaction by making their promised investment.

On May 6, 1993 Continental filed a motion in the district court to dismiss the Trustees' appeals as moot, which the district court granted on December 30, 1993. The Trustees filed a motion for rehearing and reconsideration in light of the decision in Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.), 10 F.3d 944 (2d Cir. 1993) [hereinafter Chateaugay II], which the court denied. The Trustees then filed a timely notice of appeal. This court has jurisdiction pursuant to 28 U.S.C. 158(d).

A panel of this court heard argument on September 15, 1995 and issued an opinion that affirmed the district court's order by a two-to-one vote. The Trustees petitioned for rehearing, and the in banc court voted to rehear the appeal. Under this court's Internal Operating Procedures, the opinion of the panel issued February 7, 1996 was withdrawn.

## II.
## DISCUSSION
### A.

This court has not addressed the interesting and challenging questions raised by the bankruptcy court's holding that a creditor must file a motion to lift the automatic stay as a prerequisite to seeking adequate protection. The Trustees argue that the bankruptcy court erred as a matter of law and that this court can decide the issue de novo even though it was not reached by the district court. They further argue that the bankruptcy court's finding that there was no diminution in the market value of the Trustees' collateral after they filed their Lift-Stay Motion was clearly erroneous. Finally, they argue that the bankruptcy court erred as a matter of law in denying their motion for the establishment of a cash deposit.

Not surprisingly, Continental, as appellee, defends both the bankruptcy court's legal determination that the Trustees could not assert adequate protection claims for alleged market value decline during the period before they moved for relief from

the automatic stay and its factual conclusion that there had been no substantial decline in the value of the collateral since the Lift-Stay Motion was filed. Finally, it argues that in any event the Trustees could not recover for adequate protection because the value of the collateral did not decline below its value on the petition date, which Continental contends is the relevant measure.

We would reach these issues only if we were satisfied that the district court erred in holding that the Trustees' appeals to it were "moot," a decision as to which the parties vigorously disagree. Mootness vel non of the appeals before the district court is closely related to, if not indistinguishable from, the question whether the appeal to this court is moot, an issue which Continental alludes to in its brief. For convenience, we will refer to mootness in the district court unless we state otherwise.

Continental does not contend that the appeals to the district court or to us were moot in the constitutional sense, implicating the case or controversy requirement of Article III, 1. See, e.g., Preiser v. Newkirk, 422 U.S. 395, 401-02 (1975). This is not a situation analogous to those where the Supreme Court determined that the appeals became moot because the law at issue was repealed, see Diffenderfer v. Central Baptist Church, 404 U.S. 412, 414-15 (1972); the subject of the election campaign controversy was no longer a candidate, see Golden v. Zwickler, 394 U.S. 103, 109-10 (1969); or the railroad whose application for tariffs was contested withdrew that application, see A.L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 329-30 (1961).

Indeed, as the Supreme Court has recently explained, an appeal is moot in the constitutional sense only if events have taken place during the pendency of the appeal that make it "impossible for the court to grant 'any effectual relief whatever.'" Church of Scientology v. United States, 506 U.S. 9, 12, 113 S. Ct. 447, 449 (1992) (quoting Mills v. Green, 159 U.S. 651, 653 (1895)). An appeal is not moot "merely because a court cannot restore the parties to the status quo ante. Rather, when a court can fashion 'some form of meaningful relief,' even if it only partially redresses the grievances of the prevailing party, the appeal is not moot." RTC v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 560 (3d Cir. 1994) (in banc) (quoting Church of Scientology, 113 S. Ct. at 450). Thus, in Isidor Paiewonsky Associates v. Sharp Properties, Inc., 998 F.2d 145, 152 (3d Cir. 1993), we concluded that because we could impose at least one of the remedies enumerated by the appellant, and thereby provide it "some effective relief," the appeal was not moot. See also Swedeland, 16 F.3d at 559-60. That is not the issue in this case.

Instead, Continental invokes the broader interpretation of mootness applied in bankruptcy cases, often referred to as "equitable mootness." See, e.g., Manges v. Seattle-First Nat'l Bank (In re Manges), 29 F.3d 1034, 1038-39 (5th Cir. 1994), cert. denied, 115 S. Ct. 1105 (1995); In re Specialty Equip. Cos., 3 F.3d 1043, 1048 (7th Cir. 1993); Official Comm. of Unsecured

Creditors of LTV Aerospace & Defense Co. v. Official Comm. of
Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.),
988 F.2d 322, 325 (2d Cir. 1993) [hereinafter Chateaugay I];
Rochman v. Northeast Utils. Serv. Group (In re Public Serv. Co.),
963 F.2d 469, 471-72 (1st Cir.), cert. denied, 506 U.S. 908
(1992); First Union Real Estate Equity & Mortgage Invs. v. Club
Assocs. (In re Club Assocs.), 956 F.2d 1065, 1069 (11th Cir.
1992); Central States, Southeast and Southwest Areas Pension Fund
v. Central Transp., Inc., 841 F.2d 92, 95-96 (4th Cir. 1988); In
re AOV Indus., 792 F.2d 1140, 1147 (D.C. Cir. 1986); Trone v.
Roberts Farms, Inc. (In re Roberts Farms, Inc.), 652 F.2d 793,
796-97 (9th Cir. 1981).  Under this widely recognized and
accepted doctrine, the courts have held that "[a]n appeal should
. . . be dismissed as moot when, even though effective relief
could conceivably be fashioned, implementation of that relief
would be inequitable."  Chateaugay I, 988 F.2d at 325.

     The use of the word "mootness" as a shortcut for a
court's decision that the fait accompli of a plan confirmation
should preclude further judicial proceedings has led to
unfortunate confusion.  In a trenchant discussion of the issue in
a recent decision of the Seventh Circuit, the court noted that
denominating the doctrine as "equitable mootness" is misleading.
In re UNR Indus., 20 F.3d 766, 769 (7th Cir.), cert. denied, 115
S. Ct. 509 (1994).  Judge Easterbrook, writing for the court,
stated:  "[t]here is a big difference between inability to alter
the outcome (real mootness) and unwillingness to alter the
outcome ('equitable mootness').  Using one word for two different
concepts breeds confusion." Id. (emphasis in original).  Thus,
although the discussions and applications of the concept of
"mootness" in bankruptcy cases by that court had previously
encompassed what is referred to elsewhere as "equitable
mootness," see Specialty Equip., 3 F.3d at 1048; In re
Andreuccetti, 975 F.2d 413, 418 (7th Cir. 1992), the court in UNR
Industries stated it would now "banish 'equitable mootness' from
the (local) lexicon." 20 F.3d at 769.  Instead, the court
continued, "[w]e ask not whether this case is moot, 'equitably'
or otherwise, but whether it is prudent to upset the plan of
reorganization at this late date."  Id.

     These "equitable" or "prudential" considerations focus
on "concerns unique to bankruptcy proceedings."  Manges, 29 F.3d
at 1038.  It is evident that "equitable mootness" is an inapt
description of the doctrine at issue here.  Nonetheless, since
past cases have used that term, we use it in discussing them.
Therefore, it does not further consideration of this appeal to
argue, as the dissent does, that we have "fallen into the trap"
of confusing these considerations with Article III mootness.
Whether termed "equitable mootness" or a prudence doctrine, we
see no reason why the Third Circuit should part company with our
sister circuits in their adoption of this doctrine.  If limited
in scope and cautiously applied, this doctrine provides a vehicle
whereby the court can prevent substantial harm to numerous
parties.

     The Trustees have not challenged the viability of the
doctrine of equitable mootness or application of prudential

considerations in bankruptcy cases, nor have they cited to a case in any circuit that rejects the concept.  Instead, they rely most heavily on a decision of the Second Circuit holding that even though the reorganization plan for the bankrupt LTV Corporation had been confirmed, the appeal of tax lessors challenging the plan's failure to give their claims administrative priority was not moot.  See Chateaugay II, 10 F.3d 944 (2d Cir. 1993).  Significantly, the court in Chateaugay II did not quarrel with the doctrine, merely its application in that case.  In fact, in RTC v. Best Products Co. (In re Best Products Co.), 68 F.3d 26, 29 (2d Cir. 1995), a more recent case from the Second Circuit, the court once again emphasized the language in Chateaugay I that even though an appeal may not be moot in the sense of Article III of the Constitution, it may be deemed moot in bankruptcy cases because of "equitable considerations."

We have generally stated that we exercise plenary review of a district court's decision on mootness.  SeeSwedeland, 16 F.3d at 559; Northeast Women's Ctr., Inc. v. McMonagle, 939 F.2d 57, 61 (3d Cir. 1991); International Bhd. of Boilermakers v. Kelly, 815 F.2d 912, 914 (3d Cir. 1987).  However, none of those cases involved a determination, like the one we review here, that an appeal following a consummated bankruptcy reorganization should be dismissed for equitable and prudential reasons even though some effective relief is available.  Surprisingly, we have seen little more than a few cursory references to the standard of review in the cases from other circuits applying this doctrine.  See AOV Indus., 792 F.2d at 1148 (district court's power to dismiss appeal as moot "discretionary"); Club Assocs., 956 F.2d at 1069 (legal determinations reviewed de novo, bankruptcy court's factual findings reviewed for clear error).

Because the mootness determination we review here involves a discretionary balancing of equitable and prudential factors rather than the limits of the federal courts' authority under Article III, using ordinary review principles we review that decision generally for abuse of discretion.  Cf. General Glass Indus. Corp. v. Monsour Medical Found., 973 F.2d 197, 200 (3d Cir. 1992) (abstention determination reviewed under abuse of discretion standard); Bermuda Express, N.V. v. M/V Litsa, 872 F.2d 554, 557 (3d Cir.) (balancing of equities involved in application of laches doctrine reviewed for abuse of discretion), cert. denied, 493 U.S. 819 (1989); Bennett v. White, 865 F.2d 1395, 1402 (3d Cir.) (scope of a remedial order reviewed for abuse of discretion), cert. denied, 492 U.S. 920 (1989); Evans v. Buchanan, 555 F.2d 373, 378–79 (3d Cir.) (in banc) (same), cert.denied, 434 U.S. 880 (1977).  A particular case may also raise legal and/or factual issues interspersed with the prudential ones, and then the applicable review standard, plenary or clearly erroneous, will apply.

The dissent argues that the cases cited above are inapposite because the district court acted as an appellate court and that we should therefore use plenary review.  However, the proposition that when an appellate court reviews a lower court's balancing of prudential factors, it does so under an abuse of

discretion standard as long as the factors considered are not inappropriate as a matter of law is a general one applicable in all fields, not excluding bankruptcy.  As the Fifth Circuit noted in a bankruptcy case:

> In this particular case, we are reviewing the decision of the district court in its capacity as an appellate court.  Several different standards of review govern our decision, depending on the nature of the holdings reviewed.  Where the disputed holding involves a matter that is within the district court's discretion, we will affirm the judgment of a district court acting in its appellate role unless the court has clearly abused its discretion.

Matter of HECI Exploration Co., Inc., 862 F.2d 513, 519 (citations omitted).

## B.

Factors that have been considered by courts in determining whether it would be equitable or prudential to reach the merits of a bankruptcy appeal include (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.  See Manges, 29 F.3d at 1039; Rochman, 963 F.2d at 471-72.  The Trustees have not taken issue with our identification of these factors.

Although these five factors have been given varying weight, depending on the particular circumstances, the foremost consideration has been whether the reorganization plan has been substantially consummated.  This is especially so where the reorganization involves intricate transactions, see Rochman, 963 F.2d at 473-74 (performance under plan involved "numerous complex arrangements"); Roberts Farms, 652 F.2d at 797 (plan involved "many intricate and involved transactions" and reversal of plan's confirmation "would knock the props out from under" such transactions and "create an unmanageable, uncontrollable situation for the Bankruptcy Court"), or where outside investors have relied on the confirmation of the plan, see Manges, 29 F.3d at 1039 (equitable mootness "protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance upon the plan as implemented"); UNR Indus., 20 F.3d at 770 ("[b]y protecting the interests of persons who acquire assets in reliance on a plan of reorganization, a court increases the price the estate can realize ex ante, and thus produces benefits for creditors in the aggregate"); Rochman, 963 F.2d at 474 (reorganization involved $1.5 billion in financing from 100,000 sources); Club Assocs., 956 F.2d at 1070 ("a number of investors, who were not parties to this case, had committed new funds to the 'reemerged Club' with the expectation of receiving a preferred return on their investments").

"Substantial consummation" is defined in the Bankruptcy Code as: "(A) transfer of all or substantially all of the

property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." 11 U.S.C.  1101(2).  In such instances, the strong public interest in the finality of bankruptcy reorganizations is particularly compelling.

The district court dismissed the Trustees' appeals to it as "moot" based on the conclusions, set forth in its opinion dated December 30, 1993, that substantial consummation of the Plan had occurred, the Investors had already made their $450 million investment into the reorganized entity, all elements of the Plan, except distributions to the unsecured creditors, had been completed, and a reversal of the order confirming the Plan likely would put Continental back into bankruptcy.  App. at 1873. The court also noted that Continental had implemented the Plan following its approval by the court because the Trustees had failed to obtain a stay.

The Trustees do not challenge that there had been substantial consummation by December 1993, when the district court dismissed the appeals as moot.  They suggest that as their object is not to disturb the reorganization, but only to get payment from the reorganized Continental for their adequate protection claim measured by the market value decline of the collateral during bankruptcy, the line of cases upon which Continental relies is inapplicable.  We cannot agree, because the rejection of the Trustees' claim by the bankruptcy court was inextricably intertwined with the implementation of the reorganization.  See AOV Indus., 792 F.2d at 1148 (to evaluate mootness, court must "scrutinize each individual claim, testing the feasibility of granting the relief against its potential impact on the reorganization scheme as a whole").  Thus, the Trustees cannot avoid the effect of the substantial consummation of the reorganization plan so readily.

Inasmuch as Continental agrees that the issue is not constitutional mootness but prudential mootness, we will assume arguendo that even after substantial or total consummation of its reorganization, some effective relief would have been available for the Trustees' claim at the time they appealed to the district court, and on appeal to this court.  Even before the in banc court, Continental has not challenged that assumption.  It is quite another matter in light of the substantial, indeed irrevocable, change in the status quo that followed confirmation to determine that it would have been prudent for the court to reach the merits of the Trustees' claim.  For the district court had before it an unstayed bankruptcy reorganization plan, and many courts have based their prudential decisions to decline to consider challenges to bankruptcy court orders on the ground that there has been substantial consummation of a plan of reorganization in reliance upon an unstayed confirmation order. See, e.g., Rochman, 963 F.2d at 475.

In Chateaugay I, the court noted that although the Bankruptcy Code only requires a stay pending appeal in limited

circumstances, there is a procedure under Bankruptcy Rule 8005 to seek to preserve the status quo and "[t]he party who appeals without seeking to avail himself of that protection does so at his own risk."  988 F.2d at 326.  And in In re Manges, the court observed, under the descriptive title "Halting the Runaway Train: the Motions to Stay," that "in many of the cases in which bankruptcy appeals were dismissed as moot, the appellants failed to seek a stay."  29 F.3d at 1039.

Even the seeking of a stay may not be enough.  The appellants in In re UNR Industries had sought a stay, albeit unsuccessfully, at every opportunity; nonetheless, the court noted, "[a] stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization." 20 F.3d at 770; accord AOV Indus., 792 F.2d at 1144, 1146–47.

Shortly after the confirmation of the Continental Plan, the Trustees filed an Emergency Motion for Conditional Stay of Order Confirming the Plan pending their appeal to the district court.  The condition the Trustees sought in lieu of a stay was the establishment of a segregated account for $117 million, the full amount of their adequate protection claim, or alternatively at least $22 million, which they claim was the admitted decline in the value of the collateral.  See App. at 1721.  In response to the district court's inquiry, they conceded that they were not willing to post any bond.  The district court never required a supersedeas bond in the amount of $450,000,000, as the Trustees have suggested.  In fact, the district court tried to ascertain the amount of bond that would be reasonable, and the Trustees' general position was that they were "merely the fiduciary of the money of their bondholders" and they suggested no lesser amount. App. at 1729.

Thus, as one of the reasons for its order denying the stay, the district court noted the unwillingness of the Trustees to post a bond satisfactory to the court.  App. at 1756.  See, e.g., Central States, 841 F.2d at 95 (appellant's failure to post bond to stay confirmation order basis for finding appeal moot).  Because the failure to post the bond needed to get a stay permitted the consummation of the plan, this factor weighs heavily in favor of the district court's declination to delve into the merits of the Trustees' appeal.

The Trustees argue that this court has held that failure to obtain a stay does not necessarily render an appeal moot.  The cases to which they refer are not apposite.  In one, In re Joshua Slocum Ltd., 922 F.2d 1081 (3d Cir. 1990), the issue was the narrow one of the power of the bankruptcy court to excise a paragraph from a shopping center lease.  There is no indication in Slocum that there had been any confirmation of a plan before or during the appeal.

In the more recent case to which the Trustees refer, Megafoods Stores, Inc. v. Flagstaff Realty Assocs. (In re Flagstaff Realty Assocs.), 60 F.3d 1031 (3d Cir. 1995), the appeal also presented a narrow landlord–tenant issue, i.e. the effect of confirmation of the landlord's plan on a tenant's right to pursue its appeal of the bankruptcy court's denial of its recoupment claim.  In holding that it was not necessary for the

tenant to seek a stay in order to pursue its right to appeal despite the confirmation in the interim, we noted the line of cases placing recoupment and setoff in a special category and stated, "although we recognize the importance of maintaining the integrity of confirmed plans from later attack, these unique circumstances permit the plan to be reopened and readjusted." Id. at 1036. Thus, neither Flagstaff nor Slocum addressed the equitable or prudential mootness considerations at issue here.

High on the list of prudential considerations taken into account by courts considering whether to allow an appeal following a consummated reorganization is the reliance by third parties, in particular investors, on the finality of the transaction. See Manges, 29 F.3d at 1039 ("[t]he concept of 'mootness' from a prudential standpoint protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance upon the plan as implemented"); Rochman, 963 F.3d at 474-75 (similar). Here, the record is replete with evidence that the Investors relied on the bankruptcy court's unstayed Confirmation Order in making the decision to proceed to close the transaction and that an essential factor in that decision was the bankruptcy court's disallowance of the Trustees' adequate protection claim.

The Plan of reorganization provided that the reorganized Continental would pay "Allowed Administrative Claims." App. at 656, 691 (Plan   5.5, 10.1). Among the administrative claims that were still disputed at the time of the confirmation hearing were several large claims, including, in particular, labor claims by airline pilots, large claims by Eastern Airlines, and the Trustees' claim for adequate protection based on alleged market decline of the collateral. App. at 1223, 1346. One of the concerns of the Investors that needed to be satisfied as a condition of their participation was that the total amount that would have to be paid for allowed administrative claims could be distorted by a few such large claims. To limit their exposure, the Investment Agreement provided that the Investors' obligation to proceed with the arrangements was subject, inter alia, to the payments and obligations for administrative claims being no higher than a specified amount, or "cap." App. at 408.

At the confirmation hearing, Continental's expert witness testified that if the claims of the Airline Pilots and the Trustees were excluded, the total allowed administrative claims payable under the Plan would be close to the cap, and that if the Trustees' claim were allowed, the cap would be exceeded, allowing the Investors to walk away from the deal. App. at 1223-24, 1333-38. Based on this testimony, Continental argued to the bankruptcy court that the feasibility determination required for confirmation under 11 U.S.C.  1129(a)(11) would turn in part on the adjudication of the Trustees' still outstanding administrative claim. App. at 1400. Continental therefore urged the court to incorporate its adjudication of the Trustees' claim into the Confirmation Order itself, asserting that the Investors would not go forward with the deal "unless there is an order upon which they can place reliance, which is going to be a plan

confirmation order." App. at 1400. The Trustees argued against incorporation, taking the position that even though the amount of the adequate protection claim allowed by the court would be relevant to the court's subsequent determination of feasibility, the adjudication of the claim itself was a separate matter from plan confirmation. App. at 1401.

The bankruptcy court ultimately took the approach urged by Continental, incorporating into its Confirmation Order its decision denying the Trustees' adequate protection claim. As part of its feasibility determination, it explicitly found that neither the pilots' claims nor the Eastern claims was entitled to administrative priority, and that the Trustees' adequate protection claim had no value as an administrative claim. App. at 1549-51. On that basis, it found that there was substantial, credible and uncontested evidence that the administrative claims payable at confirmation -- excluding the claims of the pilots, Eastern, and the Trustees -- would be within the specified limit of the cap set forth in the Investment Agreement, App. at 1548, noting that the adjudications of the Trustees' claim and the Eastern claims were "crucial to the willingness of the Investors to consummate the Financing Transaction." App. at 1550.

We are unwilling to accept the Trustees' suggestion, implicit in their briefs and made explicit at oral argument, that the bankruptcy court's ruling on the merits of their adequate protection claim was colored by a so-called "ultimatum" from Continental that if the claim were granted the Investors would abandon the reorganization. See In Banc Argument Transcript at 3. The Trustees offer no evidence in support of this suggestion, and we certainly would not lightly impute such a motive to the bankruptcy court. In effect, the Trustees are challenging the Investors' right to condition their investment on the amount of approved administrative claims. This was never raised below at the time of the Investment Agreement, the ultimate confirmation or the period between. We know of no statute, rule or precedent that would deny investors the right to limit their investments on the existence of conditions which they believe give the newly reorganized company a reasonable opportunity to succeed -- such as, in this case, without being weighed down by excessive administrative expenses.

The Trustees also argue that Continental's position at the confirmation hearing, that the adjudication of the Trustees' claim should be incorporated into the Confirmation Order, was a "ploy" to "disingenuously" use the fact of such incorporation to "manufactur[e] the appearance of mootness." Appellants' Brief at 3; In Banc Argument Transcript at 1. Their characterization of Continental's position as a "ploy" implies that it had no legitimate reason. In light of the integral nexus between the feasibility of confirmation and the adjudication of the Trustees' claim, it appears that the suggestion of incorporation urged by Continental and adopted by the bankruptcy court was reasonable and reflected the inescapable fact that the Trustees' claim and the confirmation of the Plan were inextricably intertwined, rather than an attempt to "manufacture" the appearance of equitable mootness.

In dismissing the Trustees' appeals as moot, the district court specifically found that the Investors had relied on the bankruptcy court's unstayed Confirmation Order and that there was an integral nexus between the investment and the success of the Plan. The court stated, "[t]he Investors relied on the unstayed Confirmation Order in making the $450 million investment in Continental's Plan. It is clear that [the Trustees'] requested relief would undermine the grounds which the Investors relied upon in making their investment and would require a dismantling of the entire Plan." App. at 1874. Although the Trustees argue that this finding is erroneous, there is support for it in the record.

At the hearing in April 1993 before the district court on the Trustees' request for the conditional stay of the Confirmation Order, counsel for the Trustees stated they had testimony that "as a matter of business judgment, it would be extremely unlikely for the investors to walk away from this deal if . . . a 22-million-dollar deposit was established." App. at 1727. The Trustees' counsel in effect challenged the Investors to assert otherwise, stating that inasmuch as the Investors' counsel were in court they could correct any assertions that he made. Id. Thereafter, the Investors' attorney rose "to make clear the [I]nvestors' position, which is that if the relief is granted to [the Trustees] which they seek from the Court this morning [the stay conditioned on a deposit of some $22 million to $117 million], then we are not prepared to close the transaction." App. at 1744.

The representative of the Investors explained that in the airline business "there is a great sensitivity to cash and the capital structure of a reorganized entity," and that the relief that the Trustees sought "could significantly impair the capital structure that would exist with respect [to] this reorganized airline." Id. at 1744-45. He reviewed the negotiations that had occurred for the cap for administrative expense liability, advised that the Investors had monitored on a monthly basis Continental's performance in that respect, and explained that the Investors had insisted that the Confirmation Order address the issue of the Trustees' claim "because we want to make sure if we are putting our money in, we are getting the benefit of our bargain, which is a reorganized entity with a capital structure that we contemplated." App. at 1746. He concluded by stating unequivocally that if a stay were entered conditioned upon the bond the Trustees sought, then his client "would not be prepared to close this transaction." Id. The Trustees' counsel did not thereafter argue that the Investors' counsel's statements were insufficiently probative, and therefore that suggestion here is less than persuasive.

The Trustees have not contested here that if their claim for market value decline of the collateral (a claim independent of their claim for the use and maintenance of the collateral, which has been satisfied) had been approved as an administrative claim, the total such administrative claim would have greatly exceeded the cap specified by the Investors for that purpose. This would have given the Investors the option to

withdraw; such withdrawal would have placed the entire Plan in jeopardy. By the time the district court ruled on the appeal, it was no longer possible to restore the parties to their earlier positions because the investment had been made, and the option to withdraw was no longer available to the Investors. See Specialty Equip., 3 F.3d at 1049 (claim held moot when its acceptance "would amount to imposing a different plan of reorganization on the parties"). Thus, the third factor bearing on the prudential determination whether to reach the merits of a bankruptcy appeal after confirmation and in the absence of a stay -- the effect of the requested relief on the rights of parties not before the court -- weighs heavily against the Trustees.

This factor cannot fairly be recast as whether the Investors or others reasonably relied on the prediction that the Trustees would recover nothing on their claim. While we agree that reliance of the Investors and others on the unstayed Confirmation Order is of central importance to our analysis, to focus on the "reasonableness" of that reliance, at least as measured by the likelihood of reversal on appeal, is necessarily a circular enterprise and therefore of little utility. Whether the Investors were reasonable in relying on the bankruptcy court's order depends on whether this was a case that would be considered on the merits on appeal or would be dismissed on the basis of the doctrine often referred to as "equitable mootness." And whether this case would be dismissed on "equitable mootness" grounds on appeal in turn depends on whether the Investors reasonably relied. Thus, placing the focus on the reasonableness of the Investors' reliance as measured by the probability that Continental would prevail on appeal sets up a straw man which is easily knocked down.

Our inquiry should not be about the "reasonableness" of the Investors' reliance or the probability of either party succeeding on appeal. Rather, we should ask whether we want to encourage or discourage reliance by investors and others on the finality of bankruptcy confirmation orders. The strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization, reflected in the Code itself, clearly weighs in favor of encouraging such reliance. Indeed, the importance of allowing approved reorganizations to go forward in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine. See Rochman, 963 F.2d at 471-72; Metro Property Mgmt. Co. v. Information Dialogues, Inc. (In re Information Dialogues, Inc.), 662 F.2d 475, 477 (8th Cir. 1981). Where, as here, investors and other third parties consummated a massive reorganization in reliance on an unstayed confirmation order that, explicitly and as a condition of feasibility, denied the claim for which appellate review is sought, the allowance of such appellate review would likely undermine public confidence in the finality of bankruptcy confirmation orders and make successful completion of large reorganizations like this more difficult. This is true regardless of whether the Investors' reliance was "reasonable" or based on a 30%, 60%, or 100% probability of success on appeal, an issue raised at the oral argument.

In arguing against dismissal here on the basis of prudential considerations, the Trustees repeatedly rely on their assertion that the Plan contained "a built-in mechanism for the [post-confirmation] disposition and payment of Disputed Administrative Claims." Appellants' Brief at 10. On the basis of this provision, they argue that they had no obligation to take steps to preserve the status quo through a stay, that their appeal is not moot because "some effective relief" is available, and that the Plan is contractually "binding" on Continental. They conclude that the district court therefore erred in "permitt[ing] Continental to escape its 'contractual' obligations under the Plan under the guise of the mootness doctrine." Appellant's Brief at 20. While the Trustees' description of the "mechanism" provided in the Plan is technically correct, they overstate the impact of that mechanism.

Under the definitions in the Plan, the Trustees' claim was a "Disputed Administrative Claim" because it sought adequate protection payments, see App. at 623-24 (Plan  1.4(vi)) and was the subject of a timely objection, see App. at 632 (Plan 1.85(a)). The Plan requires the reorganized Continental to pay allowed administrative claims on the later of: the effective date of confirmation or "the fifth Business Day after such Claim is Allowed." App. at 691 (Plan  10.1). Further, the Plan provides that "[a] Disputed Claim shall be an Allowed Claim if, and only to the extent that, such Disputed Claim has been Allowed by a Final Order," App. at 623 (Plan  1.5), and defines a "Final Order" as "[a]n order which is no longer subject to appeal, certiorari proceeding or other proceeding for review or rehearing, and as to which no [such proceeding is] pending," App. at 635 (Plan  1.100).

Thus, the Plan imposes an obligation on the reorganized Continental to pay disputed administrative claims once they become allowed by a final order of court, even if such final order does not occur until after confirmation. If the bankruptcy court's disallowance of the Trustees' claim were to be reversed on appeal, the Plan appears to provide a "mechanism" for payment of the claim by the reorganized Continental. The mere availability of such a mechanism, however, which may prevent dismissal on the ground of Article III constitutional mootness, does not warrant reversal of the district court's order dismissing it on prudential grounds. As we have noted, the district court's "mootness" determination was based not on a finding that no effective relief was available, but rather on the finding that in light of all the circumstances, it would be inequitable to grant relief. Nor has any "contractual obligation" been violated either by Continental or the district court. Where, as here, there has been no order, final or otherwise, allowing the Trustees' disputed administrative claim, the Plan imposes no obligation on the reorganized Continental to pay it.

Finally, the Plan provisions allowing for post-confirmation payment of allowed claims in no way obviated the Trustees' obligation to seek a stay. Here, where the confirmation of the Plan and the willingness of the Investors to

go forward turned on the bankruptcy court's denial of the Trustees' claims, and where the denial of those claims was in fact incorporated into the Confirmation Order, there was a clear possibility that the Trustees' claims would become moot after consummation of the Plan, and it was therefore incumbent on the Trustees to obtain a stay.  Indeed, the record shows that all parties were well aware of the extensive legal precedent dismissing as moot or on equitable grounds appeals from unstayed consummated reorganizations.  See App. at 410 (references in the Investment Agreement); App. at 1729-30, 1741 (argument before the district court on the stay).

For similar reasons, we fail to see the inconsistency charged by the Trustees between Continental's current position as to "equitable mootness" and its argument to the bankruptcy court in response to the Trustees' Deposit Motion that the Plan would require payment of the Trustees' claim by the reorganized Continental if and when allowed.  See App. at 1039.  As noted above, the Plan imposes no obligation on Continental in the absence of a final order allowing the Trustees' claim, and the mere availability of a mechanism for granting relief does not mean the court cannot determine that in light of all the circumstances it should not even try to unscramble the eggs.

Moreover, at the time Continental argued against the Deposit Motion the bankruptcy court had not yet ruled disallowing the Trustees' claim nor cited that as an explicit basis for its feasibility determination in confirming the plan.  Accordingly, Continental did not yet have reason to know that the claim would be denied and become subject to "equitable mootness" on appeal.  As soon as the basis for this mootness argument became apparent, Continental repeatedly asserted its intention to make such an argument if an appeal was filed and no stay obtained.  App. at 1691, 1742.

The Trustees have not presented us with any arguments which would weigh against all of the prudential considerations that dictate that this consummated reorganization must be left in place.  Following confirmation, Continental was operating as a restructured company, and had entered into countless new relationships and transactions.  To convince a court to take the action sought by the Trustees which would undermine the basis for the Investors' decision to proceed, the Trustees would have to proffer a powerful reason indeed.  They have not even attempted to do so.

Arrayed against that silence are the facts that the reorganization plan was consummated, no stay was obtained, numerous other parties have changed their positions, and numerous irrevocable transactions have since been completed as a result of the consummation of the Plan.  Without listing all of such transactions set forth by Continental in its brief, we note that among those are the distribution to unsecured creditors, the merger of 53 debtors other than Continental with and into Continental, the investment of $110 million in cash by Air Partners and Air Canada in the reorganized Continental, the transfer by foreign governments of various route authorities, and the assumption by the reorganized Continental of unexpired leases

and executory contracts worth over $5.0 billion.  Thus, the key issue really is whether the district court abused its discretion in weighing the various equitable factors.  We are not prepared to hold that the balance reached by the district court was an abuse of its discretion.

Under the circumstances presented here, we can see no prudential considerations that would support an attempt by an appellate court, district or court of appeals, to fashion even a limited remedy for the Trustees.  That would necessarily entail imposing a new debt on the reorganized company, which is a different entity than it was when this case was before the district court.  Thus, we agree with the determination of the district court to dismiss the Trustees' claim.  We base our holding on our conclusion that it would be neither prudent nor equitable to grant the Trustees the relief they seek.

### III.
### CONCLUSION

For the reasons set forth we will affirm the order of the district court.

In Re:  Continental Airlines
No. 94-7748

ALITO, Circuit Judge, dissenting, joined by Judges Becker, Greenberg, Lewis, McKee and Sarokin.


The majority's decision in this case creates a bad precedent for our circuit.  The majority adopts the curious doctrine of "equitable mootness," which it interprets as permitting federal district courts and courts of appeals to refuse to entertain the merits of live bankruptcy appeals over which they indisputably possess statutory jurisdiction and in which they can plainly provide relief.  According to the majority, there is no clear rule for determining when a bankruptcy appeal is "equitably moot."  Instead, this is said to be a discretionary determination to be made in the first instance by the district court based on a weighing of five factors that the majority has culled from the opinions of our "sister circuits."  In my view, if the doctrine of "equitable mootness" has any validity, it is more limited than the majority holds.

The dangers inherent in the majority's adoption and broad interpretation of this doctrine are illustrated by this case.  In simple terms, this is what happened.  After filing for relief under Chapter 11 of the Bankruptcy Code, Continental Airlines continued to use certain aircraft and jet engines that were held as collateral entrusted to the Trustees.  Believing that their collateral was undergoing a dramatic diminution in value, the Trustees in August 1992 filed a renewed motion in the bankruptcy court seeking "adequate protection" under 11 U.S.C. 363(e).  During the next eight months, while the Continental

reorganization plan proceeded toward confirmation, the bankruptcy court did not rule on this motion. In March 1993, Continental insisted that the bankruptcy court rule on the Trustees' motion at the same time that it confirmed the plan, and Continental told the bankruptcy judge that unless the motion was denied, the prospective investors in the reorganized corporation would withhold funding, and the reorganization would not go forward. See Continental Br. at 5-6 & n.1. Furthermore, Continental took the position that if the plan was confirmed and went into effect, any appeal would be moot. See Continental Br. at 21. The bankruptcy court then simultaneously denied the Trustees' motion and entered the order confirming the plan. The Trustees exercised their statutory right to appeal to the district court, and in my view the need for review by an Article III court is particularly acute when the challenged ruling of the bankruptcy court is made under circumstances such as these.

The Trustees, however, have been utterly denied such review. In the initial level of appeal, the district court opined that the Trustees probably would have won if the merits of their appeal had been reached (JA 1755-56), but the district court dismissed their appeal as moot. Likewise, the majority of our court describes the Trustees' arguments as "interesting and challenging" (Maj. Op. at 9) but then throws them out of court without reaching the merits of their arguments. And the majority does this even though (a) this case is clearly not "moot" in any proper sense of the term, (b) we unquestionably have statutory jurisdiction, and (c) we have a "virtually unflagging obligation" to exercise the jurisdiction that we have been given. Colorado River Water Conservation District v. United States, 424 U.S. 800, 817 (1976). I am puzzled and troubled by what the majority has done.

I.

As the majority notes, the Trustees have not contested the existence of the doctrine of "equitable mootness," and in light of the Trustees' position, I think that it is appropriate to assume the existence of this doctrine for purposes of this appeal. The majority opinion, however, does not simply assume the existence of this doctrine but adopts it as part of the law of our circuit. In doing so, the majority does not undertake an independent analysis of the origin or scope of the doctrine but is instead content to rely on the decisions of other courts of appeals. From these decisions, the majority extracts five factors, which are to be weighed by the district court in the initial level of appeal for the purpose of determining whether the appeal is "equitably moot." Maj. Op. at 14. These factors are: "(1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments." Maj. Op. at 15.

I am not convinced that the majority's test is

consistent with the law of all of the circuits that the majority claims to be following.  For example, the Eleventh Circuit holds that the proper test is "whether the `reorganization plan has been so substantially consummated that effective relief is no longer available.'"  In re Club Associates, 956 F.2d 1065, 1069 (11th Cir. 1992) (quoting Miami Center Ltd. Partnership v. Bank of New York, 820 F.2d 376, 379 (11th Cir. 1987)).  This inquiry seems quite different from the majority's indeterminate five-factor test.  But even if the majority's analysis is supported by the decisions it cites, and even though I think that those decisions deserve careful and respectful consideration, I think that the in banc majority should have made an independent examination of the basis and scope of the doctrine of "equitable mootness" before engraving it in our circuit's law.

What is the basis of this doctrine?  As the majority acknowledges, it does not stem from the "case-or-controversy" requirement of Article III.  See Maj. Op. at 10.  For example, it is not argued that the case now before us is moot in the Article III sense.

Nor does it appear that this doctrine is rooted in non-Article III mootness decisions "reflect[ing] avowedly flexible doctrines of remedy and judicial administration."  13A Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure  3533.1 at 222 (1984).  These doctrines are said to focus on the question whether "granting a present determination of the issues offered, and perhaps the entry of more specific orders, will have some effect in the real world." Id. at  3533.1 at 226 (footnote omitted).  Here, it is clear that a determination of the merits of the issues raised by the Trustees and the entry of a remedial order on the basis of such a determination would have "some effect" -- and potentially quite a substantial effect -- in the real world.  (That is precisely why Continental does not want us to entertain the appeal!)

Thus, as this case well illustrates, the doctrine of "equitable mootness" is not really about "mootness" at all in either the Article III or non-Article III sense.  As the Seventh Circuit stated in a passage that the majority quotes with approval (see Maj. Op. at 12), "[t]here is a big difference between inability to alter the outcome (real mootness) and unwillingness to alter the outcome (`equitable mootness').  Using one word for two different concepts breeds confusion."  In re UNR Indus., Inc., 20 F.3d 766, 769 (7th Cir.) (emphasis in original), cert. denied, 115 S. Ct. 509 (1994).

If the doctrine of "equitable mootness" is not based on real mootness principles, on what is it based?  The cases cited by the majority and the parties suggest two possible answers.

The first is provided by the earliest court of appeals decision cited by the majority, In re Roberts Farms, Inc., 652 F.2d 793, 796-97 (9th Cir. 1981), and several others.  See In re AOV Industries, Inc., 792 F.2d 1140, 1147 (D.C. Cir. 1986); In re Information Dialogues, Inc., 662 F.2d 475, 477 (8th Cir. 1981). The modest authority on which the Roberts Farms court relied was a provision of former Bankruptcy Rule 805, which concerned stays

pending appeal.  Added by a 1976 amendment to the rule, the provision in question stated:

> Unless an order approving a sale of property or issuance of a certificate of indebtedness is stayed pending appeal, the sale to a good faith purchaser or the issuance of a certificate to a good faith holder shall not be affected by the reversal or modification of such order on appeal, whether or not the purchaser or holder knows of the pendency of the appeal.

Although I do not find the Roberts Farms opinion entirely clear, I think that the best reading of the opinion is that the challenge to the plan of reorganization in that case could not be entertained because no relief was practicable as a result of the many post-confirmation transactions that were irreversible due to this provision of former Rule 805.  See 652 F.2d at 797.  In any event, whether or not this is what the Roberts Farms court meant to say, I do not see how any broader rule could reasonably be extracted from the provision of former Bankruptcy Rule 805 on which the Roberts Farms court relied or from the analogous provisions now contained in 11 U.S.C. 363(m) and 364(e).  If one begins with narrow provisions such as these -- which merely prevent the upsetting of certain specific transactions if stays are not obtained -- I do not see how one can derive the broad doctrine of "equitable mootness" that the majority in this case appears to embrace.

What apparently happened, however, was that the holding of Roberts Farms was gradually extended well beyond anything that could be supported by the authority on which Roberts Farmsrested. Subsequent cases first cited Roberts Farms in support of the proposition that a bankruptcy appeal cannot be entertained if the court could not grant "effective relief."  See, e.g., In re Information Dialogues, Inc., 662 F.2d at 477.  Later, Roberts Farms was interpreted more expansively to mean that an appeal could not be entertained if a court could not award relief that was "equitable."  See In re Chateaugay Corp., 988 F.2d 322, 324 (2d Cir. 1993) (citing Roberts Farms).  And this latter holding figures prominently in the majority's analysis.  See Maj. Op. at 12.  In my view, this gradual but ultimately quite substantial extension of Roberts Farms cannot be squared with the narrow authority on which that decision relied.  Accordingly, if anything like the majority's decision in this case is to be defended, some other foundation for the doctrine of "equitable mootness" must be found.

The second possible basis for the doctrine of "equitable mootness" is suggested in In re UNR Indus., supra, where the Seventh Circuit wrote:

> Several provisions of the Bankruptcy Code of 1978 provide that courts should keep their hands off consummated transactions. For example, 11 U.S.C.  363(m) says that the reversal of an order authorizing the sale or

lease of property of an estate "does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal."  Unless the sale is stayed pending appeal, the transaction survives even if it should not have been authorized in the first place.  See In re Sax, 796 F.2d 994 (7th Cir. 1986); cf. In re Edwards, 962 F.2d 641 (7th Cir. 1992) (concluding that  363(m) does not, however, forbid all forms of collateral attack).  Another section of the Code, 11 U.S.C. 1127(b), dramatically curtails the power of a bankruptcy court to modify a plan of reorganization after its confirmation and "substantial consummation."  Section 1127(b), unlike  363(m), does not place any limit on the power of the court of appeals, but the reasons underlying  363(m) and 1127(b) -- preserving interests bought and paid for in reliance on judicial decisions, and avoiding the pains that attend any effort to unscramble an egg -- are so plain and so compelling that courts fill the interstices of the Code with the same approach.

20 F.3d at 769.  Thus, the court seemed to say that the Bankruptcy Code contains an "interstice" -- a gap -- regarding the circumstances under which an appeal that might upset a plan of reorganization may be pursued.  Further, the court appeared to suggest that the federal courts have the authority to create a rule of federal common law to fill this gap.  See, e.g., United States v. Little Lake Misere Land Co., Inc., 412 U.S. 580, 593 (1973) (referring to the "`power in the federal courts to declare, as a matter of common law or "judicial legislation," rules which may be necessary to fill in interstitially or otherwise effectuate the statutory patterns enacted in the large by Congress'") (citation omitted).

This is an interesting theory, but I find it unnecessary to decide in this case whether it is correct.  For present purposes, what is important is to note that, even if this theory is correct, it has nothing to do with mootness.  Instead, it concerns a federal common law rule designed to promote certain policies of chapter 11 of the Bankruptcy Code.  These policies are the facilitation of reorganizations and the protection of those who reasonably rely on reorganization plans.  As I explain below, neither of these policies justifies what has happened in this case -- the refusal of the Article III courts to entertain a live appeal over which they indisputably possess statutory jurisdiction and in which meaningful relief can be awarded.

II.

A.  How can the objective of preserving the Continental reorganization justify what the majority has done?  The Trustees are not seeking to upset the plan of reorganization; rather, they are attempting to obtain payments that they claim are due to them pursuant to that plan.  Moreover, even if the success of the reorganization might be imperilled if the Trustees obtained the full relief that they are seeking -- an empirical proposition that is not self-evident -- the courts could surely fashion some measure of lesser relief that would not disturb the reorganization.  In order to justify its decision, which slams the courthouse door on the Trustees before they are even heard on the merits, the majority would have to show that the Trustees could not be awarded any relief -- not one dollar -- without upsetting the Continental reorganization, and obviously they cannot do any such thing.  I do not dispute the desirability of preserving the Continental reorganization, but to my mind this objective implicates a question of remedy, to be decided after the merits of the Trustees' arguments are addressed, and not a threshold question of "mootness."

In treating this as a threshold question, the majority, I believe, has been confused by the misleading term "equitable mootness," which, as I have discussed, does not actually involve mootness at all.  The federal courts are accustomed to considering questions of Article III mootness, and the majority, in my view, has fallen into the trap of thinking that the question of "equitable mootness" that is now before us must be treated as if it were a question of Article III mootness.  Whether a case is moot in the Article III sense is, of course, a jurisdictional question, see, e.g., Rosetti v. Shalala, 12 F.3d 1216, 1223 (3d Cir. 1993), and therefore it is a question that we are obligated to resolve before we consider the merits of an appeal.  See, e.g., United Wire Metal and Machine Health and Welfare Fund v. Morristown Memorial Hosp., 995 F.2d 1179, 1190 (3d Cir.), cert. denied, 114 S. Ct. 382 (1993); Rogin v. Bensalem Tp., 616 F.2d 680, 684 (3d Cir. 1980), cert. denied, 450 U.S. 1029 (1981).  Moreover, if we conclude that an appeal is moot in this sense, we have little remedial flexibility; we generally have no choice but to dismiss.  See, e.g., U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership, 115 S. Ct. 386, 389-90 (1994); Mills v. Green, 159 U.S. 651, 653 (1895) (when "an event occurs which renders it impossible for this court, if it should decide the case in favor of the plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal").

By contrast, the doctrine that is involved here -- which is not really a doctrine of mootness at all -- does not demand or justify similar treatment.  It does not present a jurisdictional question; we are not required to consider it before proceeding to the merits; and even if we find that it is applicable, it does not necessarily dictate that we dismiss the appeal or affirm in its entirety a district court order of dismissal.  Rather, we retain the ability to craft, or to instruct the district or bankruptcy courts to craft, a remedy

that is suited to the particular circumstances of the case. Thus, a remedy could be fashioned in the present case to ensure that the Continental reorganization is not undermined.

B. Much the same is true with respect to the objective of protecting reasonable reliance interests. In my opinion, this is also a remedial consideration; if the Trustees win on the merits, the need to protect reasonable reliance interests can be fully taken into account in crafting an appropriate remedy. I thus see no need to resolve the question of reasonable reliance interests at this time.

The majority, however, not only wrongly treats this as a threshold, rather than a remedial, consideration, but engages in an analysis that flies in the face of the language of the plan and seems to assume an extraordinary degree of naivete on the part of the Investors and the others who are said to have relied on the plan.

I will focus on the Investors because their plight looms large in the majority's analysis. When the Investors decided to invest in the reorganized company, NewCal, they knew or should have known that under the reorganization plan NewCal would be required to pay the Trustees' claim if it was ultimately allowed. Section 10.1 of the plan provided that NewCal would pay "Allowed Administrative Claims." Moreover, in order to persuade the bankruptcy court to reject the Trustees' request that a cash reserve be established prior to confirmation to cover their claim, Continental argued that such a reserve was unnecessary because if the Trustees' claim was allowed it would be "an Allowed Administrative Claim which would be paid in accordance with the terms of Section 10.1 of the Plan." JA 1039. Under these circumstances, any prudent investor, in deciding whether to invest in NewCal on particular terms, would have taken into account the range and likelihood of possible outcomes in the Trustees' appeal, including the possibility that some or all of the amount sought by the Trustees would have to be paid as an administrative claim pursuant to Section 10.1 of the plan. No reasonable investor would have proceeded on the assumption that the Trustees would definitely recover nothing. And the same is true of the other parties that relied on the plan. Thus, I am skeptical about the reliance interests that are claimed here, but in any event I fail to see why this issue needs to be resolved at the threshold of this case rather than at the remedial stage, if that stage is ever reached.

C. One final aspect of the majority opinion warrants a response, and that is the majority's discussion of the Trustees' failure to seek or obtain a stay. I have two comments regarding this discussion.

First, while it might be desirable to have a rule that flatly requires a stay whenever a party takes an appeal that might upset a plan of reorganization, neither the Bankruptcy Code nor the Bankruptcy Rules contain any such sweeping provision; our court had not adopted any such rule at the time of the Trustees' appeal (and, indeed, still has not done so); and it would consequently be unfair to apply such a rule to the Trustees retroactively.

Second, in the absence of such a blanket rule, we should focus on whether the purposes that would be served by a stay require that the Trustees be thrown out of court at the threshold. The purpose of a stay in this context is to prevent transactions that might otherwise occur in reliance on the plan of reorganization and that would be difficult or painful to undo if the appeal were to succeed. Accordingly, the Trustees' failure to obtain a stay in this case might limit the relief that would be available to them if they succeeded on the merits of their appeal, but it cannot justify the refusal at the outset even to consider their arguments.

In sum, I believe that the Trustees' claim should be entertained on the merits. The mere act of entertaining that claim would not imperil Continental's reorganization or impair any legitimate reliance interests. If the Trustees' claim were considered and they won on the merits, any threat to the reorganization or to legitimate reliance interests could be taken into account in framing the Trustees' relief. What the district court and the majority have done -- throwing the Trustees out of court before the merits of their claim are even heard -- is unjustified and unjust.

For these reasons, I respectfully dissent. I would reverse the order of the district court and remand for a decision on the merits.